*In re* HOCKING

Docket No. 99750. Argued October 11, 1995 (Calendar No. 8). Decided
March 22, 1996.

The Judicial Tenure Commission filed a formal complaint in the
Supreme Court against G. Michael Hocking, Judge of the Fifty-sixth
Judicial Circuit Court, alleging misconduct. The Honorable Joseph
B. Sullivan was appointed as master. Following hearings, the
master concluded that four of the six instances of alleged behavior
constituted misconduct. Both parties objected. After oral argument
before the Judicial Tenure Commission, the commission adopted
the majority of the master's findings, concluding that Judge Hock-
ing was guilty of misconduct for improper remarks made during
the sentencing of Timothy Hensick, that in two instances he was
rude and discourteous toward two attorneys, and that he abused
the grievance process in one instance. The commission recom-
mended that Judge Hocking be suspended from judicial office for
thirty days without pay. Judge Hocking appeals.

In an opinion by Justice Boyle, joined by Chief Justice Brickley,
and Justices Riley, Mallett, and Weaver, the Supreme Court *held*:

The exchange between Judge Hocking and attorney Elaine Sharp
in *McPherson v McPherson* violates the Code of Judicial Conduct.
In *People v Hensick*, while the Supreme Court does not condone
Judge Hocking's controversial tone and courtroom manner in
addressing attorney Pamela Maas or his rationale regarding the
defendant's state of mind, his behavior is not judicial misconduct.
Further, no pattern of misconduct was found, and Judge Hocking
did not abuse the grievance process.

In assessing the appropriate sanction in judicial disciplinary pro-
ceedings, the Supreme Court's primary charge is to fashion a pen-
alty that maintains the honor and the integrity of the judiciary,
deters similar conduct, and furthers the administration of justice. A
distinction must be maintained between protection and punish-
ment. In disciplining Judge Hocking, it is not the intention of the
Court to obstruct any judge's ability to exercise judicial discretion
or freedom of thought and expression, as long as such exercise
does not blemish the fair administration of justice. Although
neither Judge Hocking's intemperate language in addressing Ms.
Maas during the sentencing proceeding, nor his inept expression of
his reasons for finding mitigating circumstances in *Hensick* can be

condoned, the comments, individually or in combination, as well as his request for investigation of Ms. Miller, do not constitute judicial misconduct. The scathing attack on Ms. Sharp during the *McPherson* hearing, however, clearly constitutes misconduct in violation of Canons 1, 2A, 2B, 3A(3), and 3A(8), was clearly prejudicial to the administration of justice, and warrants suspension as an appropriate sanction.

Justice CAVANAGH, joined by Justice LEVIN, concurring in part and dissenting in part, stated that the complaint against Judge Hocking should be dismissed. Judge Hocking is not guilty of any judicial misconduct in either proceeding. While he should have refrained from engaging in a confrontation with the attorney in *McPherson*, such an isolated incident, while requiring private reprimand, is not clearly prejudicial to the administration of justice and should not be the subject of any suspension.

*Willingham & Cotè, P.C.* (by *John L. Cotè* and *Steven A. Mitchell*), for the respondent.

*Joseph F. Regnier*, Examiner, and *Anna Marie Noeske*, Staff Attorney, for the Judicial Tenure Commission.

BOYLE, J. Formal Complaint No. 48 was filed by the Judicial Tenure Commission[1] against Judge G. Michael Hocking on May 12, 1994, and subsequently amended on October 6, 1994. The amended complaint alleged

---

[1] The Judicial Tenure Commission was created by Const 1963, art 6, § 30(1), which states:

A judicial tenure commission is established consisting of nine persons selected for three-year terms as follows: Four members shall be judges elected by the judges of the courts in which they serve; one shall be a court of appeals judge, one a circuit judge, one a probate judge and one a judge of a court of limited jurisdiction. Three shall be members of the state bar who shall be elected by the members of the state bar of whom one shall be a judge and two shall not be judges. Two shall be appointed by the governor; the members appointed by the governor shall not be judges, retired judges or members of the state bar. Terms shall be staggered as provided by rule of the supreme court. Vacancies shall be filled by the appointing power.

that Judge Hocking engaged in acts of misconduct including improper touching, abusive courtroom behavior, inappropriate reasoning at sentencing, abuse of contempt power, abuse of the grievance process, and perjury.

The Honorable Joseph B. Sullivan, the master appointed by this Court on June 14, 1994, conducted hearings on October 25, 26, 27, 28, and November 14 and 30. The master's report, issued on December 28, 1994, concluded that four of the six instances of alleged behavior constituted misconduct. The master dismissed the charges of improper touching and perjury, finding that these allegations were not supported by a preponderance of the evidence.[2] The master further found that Judge Hocking's reasons for departing from the sentencing guidelines "showed a certain obvious lack of sensitivity towards the feeling of women generally," that on two occasions Judge Hocking was rude and discourteous,[3] and that Judge Hocking's abuse of the grievance process in two instances constituted "a failure to avoid impropriety and the appearance of impropriety, in violation of the Code of Judicial Conduct Canon 2A." While not specifically charged in the complaint, the master also made an explicit finding that there was no evidence of gender bias.

Both parties filed objections to the master's report, and oral argument was held before the commission on March 20, 1995. The commission adopted the majority of the master's findings and issued its decision and rec-

---

[2] The commission agreed that the charges of unconsented touching and perjury were not proven by a preponderance of the evidence. After reviewing the charges and the record, we also agree that these allegations have not been proven. Thus, these counts will not be discussed further.

[3] Although the master concluded that Judge Hocking had not abused his contempt authority, he did find that Judge Hocking was rude and discourteous in addressing two different attorneys in two separate cases.

ommendation of discipline on April 12, 1995.[4] In its
report, a majority[5] of the commission concluded that
Judge Hocking was guilty of misconduct for improper
remarks made during sentencing. The commission unan-
imously adopted the master's findings that in two
instances Judge Hocking was rude and discourteous
toward two attorneys, and unanimously agreed that
Judge Hocking had abused the grievance process in one
instance.[6] The commission also found a "strong indica-
tion of a pattern of gender bias," but refused to make a

---

[4] Specifically the commission found:

(1) Respondent violated the high standards of conduct necessary
to preserve the integrity of the judiciary in violation of Canon 1 of
the Code of Judicial Conduct.

(2) Respondent eroded and discouraged public confidence in the
integrity and impartiality of the judiciary by his irresponsible and
improper conduct and manner, and his failure to avoid impropriety
or appearance of impropriety, in violation of Canons 2A and 2B of
the Code of Judicial Conduct.

(3) Respondent's rude and unprofessional conduct towards
attorneys appearing before him violated Canon 3A(3)  of the Code
of Judicial Conduct.

(4) Respondent failed to avoid a controversial manner or tone
when addressing counsel, and failed to avoid interruptions of coun-
sel in their arguments, in violation of Canon 3A(8).

(5) Respondent engaged in conduct clearly prejudicial to the
administration of justice by making improper comments insulting
to the female victims during sentencing of a convicted rapist which
suggested that the victim invited the sexual assault when she
allowed the defendant, her divorce attorney, to come over in the
early hours of the morning after he told her he needed to speak
with her.

[5] Three commissioners dissented from this finding.

[6] The commission declined to find misconduct with respect to the
grievance Judge Hocking filed against attorney Elaine Sharp. After review-
ing the record, we agree with the commission that "the complaint did not
charge Respondent with filing a retaliatory or bad faith grievance against
Ms. Sharp, and that contemptuous conduct by an attorney could be a
legitimate basis for the filing of a request for investigation of attorney mis-
conduct by a judge."

formal finding in this regard because gender bias was not an allegation formally charged in the complaint.

As a result of this misconduct, a majority of the commission recommended that Judge Hocking be suspended from judicial office for thirty days without pay.[7]

On May 24, 1995, Judge Hocking petitioned this Court, pursuant to MCR 9.224 and MCR 9.225, to reject or modify the commission's recommendation, contending that the commission's findings of misconduct are erroneous.

After review of the record de novo,[8] we conclude that the exchange with attorney Elaine Sharp violates the Code of Judicial Conduct. However, while we do not condone Judge Hocking's controversial tone and courtroom manner in addressing attorney Pamela Maas, or his rationale regarding defendant Hensick's state of mind, we do not find that this behavior is judicial misconduct. Nor can we conclude that Judge Hocking abused the grievance process. The commission recommended that Judge Hocking be suspended for thirty days without pay for this misconduct. Having concluded that Judge Hocking was not persistently rude and discourteous, MCR 9.205(C), that his remarks during sentencing were not clearly prejudicial to the fair administration of justice, MCR 9.205(C) and that he did not abuse the grievance process, we find no pattern of misconduct. Judge Hocking's conduct with respect to Ms. Sharp was clearly prejudicial to the administration of justice, MCR 9.205(C)(4), and constitutes misconduct. After reviewing the record in this case and the discipline this Court has imposed in similar cases of judicial mis-

---

[7] Two commissioners filed a dissent in respect to the sanction and concluded that the proper level of discipline in this case would be public censure.

[8] In assessing the propriety of a judge's actions we review the record de novo. *In re Somers*, 384 Mich 320; 182 NW2d 341 (1971).

conduct, we find suspension an appropriate sanction, although our conclusions with regard to Judge Hocking's actions do not warrant the term of suspension recommended.

I

As the cornerstone of our tripartite system of government, the judiciary has a public trust to both uphold and represent the rule of law. Those who exercise authority and those who consent to its exercise have reciprocal obligations. Citizens are bound to observe a certain line of conduct in exchange for the protections of the law, and judges, no less than other officers of government, are bound to conduct themselves with honor and dignity.[9] Thus, the ideal judge is a person who has by habit and practice achieved self-control and acquired the virtue of being able to will and act as a just person ought to act.

But as James Madison noted early on, discipline must also come from within the system.

> If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions. [*The Federalist Papers*, No 51 (New York: Mentor-Penguin Books, 1961), p 322.]

---

[9] The law is a silent magistrate and a magistrate a speaking law. McNeil, ed, *2 Calvin, Institute of the Christian Religion* (Philadelphia, The Westminster Press, 1960), Book IV, p 1502.

The issue before us is whether the record supports the findings of misconduct with which Judge Hocking is charged, and if so, what level of discipline that conduct merits. See *In re Bennett,* 403 Mich 178, 184; 267 NW2d 914 (1978).

II

Three of the instances of misconduct alleged by the commission arise directly or indirectly from Judge Hocking's reasons for departing from the sentencing guidelines during the sentencing of Timothy Hensick after conviction for criminal sexual conduct in *People v Hensick,* Livingston Circuit Court, File No. 91-6537-FC. Although these proceedings do not involve the merits of the *Hensick* case, because the only issues before us are those relating to the recommended discipline of Judge Hocking, some background is necessary to assess the propriety of Judge Hocking's conduct and comments.

In *Hensick,* the criminal sexual conduct charges arose from allegations of oral and digital penetration committed by an attorney with a female client he was representing in divorce proceedings. Between 1:00 and 2:00 A.M. on April 29, 1990, Mr. Hensick called his client and arranged to meet with her at her apartment a short time later. After he arrived, there were two instances of fellatio and Hensick penetrated her digitally. Hensick claimed the sex was consensual and that they parted amicably. His client, however, filed charges claiming that the contact was involuntary.

The element of force or coercion was vigorously disputed by the parties at trial. There was no evidence of physical blows or use of a weapon, or any allegations by the complainant that Hensick used verbal threats to compel her to yield to his advances. Although there was testimony that the complainant herself admitted that Hensick had not threatened her and that perhaps Hen-

sick did not know how she felt, at trial she testified that she was too frightened to resist participating in the aforementioned acts.

The jury accepted the complainant's version of the incident, finding sufficient evidence of coercion to convict Hensick of three counts of first-degree criminal sexual conduct.[10] At sentencing, Judge Hocking denied a defense motion for a directed verdict, finding that there was sufficient evidence regarding each element of the crime. He went on to observe, however, that this was the weakest criminal case he had ever seen stating, "had I tried this case without a jury, I would have acquitted the Defendant . . . ." As Judge Hocking began to pronounce sentence, it was apparent that he intended to deviate significantly downward from the sentencing guidelines because he felt the guidelines did not adequately deal with the facts of the case. Shortly after he began his lengthy explanation of why he thought the guidelines were inapplicable, assistant prosecuting attorney Pamela Maas rose to her feet and attempted to argue that the scoring of the guidelines was not at issue because Hensick did not contest the scoring. Judge Hocking angrily ordered Ms. Maas to sit down stating that she could appeal if she did not like what he had to say.

As suddenly as the outburst arose, his demeanor returned to normal and he proceeded to explain why he believed this Court's opinion in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), required him to depart from the sentencing guidelines.

---

[10] MCL 750.520b; MSA 28.788(2).

This background sets the stage for the following misconduct charges.[11]

### III

Two allegations of misconduct arose directly from the *Hensick* sentencing: first, that Judge Hocking's justifications for departing from the guidelines were blatantly improper and sexist; second, that Judge Hocking was impermissibly rude during the colloquy with assistant prosecutor Maas.

Judge Hocking was clearly in absolute disagreement with the jury verdict finding the defendant guilty of three counts of first-degree criminal sexual conduct.[12] The jury reached its decision on the basis of sufficient evidence to prove every element of the crime, however, and Judge Hocking knew the sentencing guidelines required him to impose a prison term of ten to twenty-

---

[11] The sentencing proceedings in this case were videotaped, and the Court has reviewed this tape extensively in evaluating the charges of misconduct.

[12] During the sentencing proceedings, he made the following statements:

There's no—let there be no question about the fact that had I tried this case without a jury, I would have acquitted the Defendant, that's not the test for this motion.

\*     \*     \*

One factor I have to consider is that this was the weakest criminal case that resulted in a conviction that I've ever seen, and I've been an attorney for 15 years, 14 of which I was a Prosecuting Attorney.

\*     \*     \*

Another issue, which is the crux of my granting an appeal bond, is the severity of the weakness of the Prosecution's case; that is, if this Court sat without a jury and did its duty, it was clear that the Prosecution failed to prove the case beyond a reasonable doubt. I would have acquitted this Defendant.

five years or to provide adequate justification for deviating downward. Therefore, to justify his significant downward departure,[13] Judge Hocking apparently felt he had to sequentially eliminate all conceivable grounds for why the sentence should not be higher.

In discussing why a lower sentence was appropriate, Judge Hocking moved through approximately a dozen numbered reasons to depart from the guidelines. He repeatedly stated that his principal basis for his sentencing analysis was *People v Milbourn, supra*. Having argued *Milbourn* before this Court, Judge Hocking believed this Court's opinion in that case required that he deviate from the guidelines if he felt the guidelines did not address the facts of the case.

Two of the twelve reasons given to justify the sentence imposed became the focus of national media attention. In considering where the facts of this case fell on the continuum of criminal sexual conduct cases, Judge Hocking stated:

> A mitigating factor, although minor, is evidence that the Defendant helped the victim up off the floor after the occurrence. Another mitigating factor—that the victim told a spouse-abuse agency the sex was not forced but resistance—her resistance was worn down by the Defendant's persistent request.

Judge Hocking also used language that was interpreted to mean that a lesser sentence was appropriate because "the victim asked for it." In addressing what he felt was the defendant's lack of culpability, as compared to other offenses and offenders, he stated:

---

[13] Judge Hocking imposed concurrent sentences of eighteen months to ten years in prison for each of the three counts.

[T]he fact that the victim agreed to the Defendant's 2:00 A.M., Sunday morning visit is a mitigating circumstance, again with regard to the presence of an evil state of mind on behalf of the Defendant. This is not a perfect world, but as common sense tells me that when a man calls a woman at 2:00 A.M. and says he wants to come over and talk and he's—that's accepted, a reasonable person, whether you want to shake your head or not, Ms. Maas, I haven't been living in a shell. A reasonable person understands that means certain things. They may be wrong.

\*    \*    \*

In this regard, I do not find any credible evidence that the victim consented to the Defendant's visit for professional reasons. The jury could believe whatever they want.

The commission adopted the master's conclusion that "statements of that nature[14] hold the court up to ridicule in violation of the standards of judicial conduct."

In reviewing Judge Hocking's comments, we note that, generally, a judge is not subject to discipline for "appealable errors of law or abuses of discretion," *In re King*, 409 Mass 590, 601; 568 NE2d 588 (1991), and "[j]udicial error alone is not a sufficient basis upon which to found violations of the Code of Judicial Conduct . . . ." *In re Elliston*, 789 SW2d 469, 477 (Mo, 1990). However, as the commission notes, the justification for departure—the act of judicial discretion—is not at issue in this case. Judge Hocking is not subject to discipline for his decision to depart downward on the basis of the facts of the case. Relief for unjustified departure, if warranted, is available through

---

[14] The master found and the commission agreed that these statements were "bizarre" and "showed a certain obvious lack of sensitivity towards the feeling of women generally . . . ."

appeal. Whether relief on appeal is warranted or not,
it does not follow that a judicial officer is immune
from discipline for the manner in which the decision
is articulated.

It is clear, however, that every graceless, distaste-
ful, or bungled attempt to communicate the reason
for a judge's decision cannot serve as the basis for
judicial discipline. We are committed to eradicating
sexual stereotypes, but we cannot ignore the cost of
censoring inept expressions of opinion. The commis-
sion's contention that Judge Hocking's comments
were "rife with remarks revealing his frustration with
the jury verdict and his sympathy for the defendant"
illustrates the problem.

Judge Hocking was obviously straining to find
ground to justify a reduced sentence. However, disa-
greement with a jury verdict is not improper, and
sympathy for a defendant a judge believes to have
been wrongfully convicted is not inappropriate. The
rationale for a severe sentence would inevitably have
a negative effect on those who disagree with the ver-
dict, and "sympathetic" remarks would have a nega-
tive effect on those who believed the verdict was cor-
rect. In short, we would discourage honest explana-
tion of the rationale for tailoring sentences to the
offender and the offense were we to define miscon-
duct from the perspective of the person most sensi-
tive to such remarks.[15] Similarly, both the trial judge's
responsibility to find facts in a bench trial and to con-
trol proceedings would be substantially compromised
if, absent discriminatory animus or a pattern of

---

[15] MCR 9.205(C)(6), (7). *In re Del Rio*, 400 Mich 665, 717-718; 256
NW2d 727 (1977).

behavior, remarks—critical or disapproving of counsel, the parties, or their cases—constituted misconduct in office.

A judge's comments are not immune from censure simply because they are based on facts adduced at trial or events occurring at trial. However, where a judge is stating an opinion drawn from his knowledge of the proceedings, the threshold for a finding of misconduct must be flexible enough to accommodate the imperatives of the system.[16] A judge's mode of articulating a basis for decision may exhibit such a degree of antagonism or other offensive conduct that a single incident would indicate that impartial judgment is not reasonably possible. In that event, the judge has prejudiced the administration of justice because the conduct undermines public confidence in the impartiality of justice.

We conclude that the line between insensitive comment[17] and conduct that is clearly prejudicial to the administration of justice requires us to assess the communication of judicial opinion from an objective perspective. Comment based on knowledge acquired during a proceeding is misconduct when it is so clearly unacceptable that it displays an unfavorable

---

[16] As Justice Scalia recently noted in *Liteky v United States*, 510 US 540, 555-556; 114 S Ct 1147; 127 L Ed 2d 474 (1994) "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish bias or partiality. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."

[17] We emphasize that these remarks did not involve injecting extraneous matters into the proceedings, or explicitly demeaning remarks, *In re Probert*, 411 Mich 210, 235; 308 NW2d 773 (1981), nor did they involve abusive language or an abusive manner, *In re Bennett, supra*.

predisposition indicating an inability to impartially determine the facts. See *Liteky v United States*, 510 US 540, 551; 114 S Ct 1147; 127 L Ed 2d 474 (1994), or when, in combination with other conduct violative of MCR 9.205, it is clearly prejudicial to the fair administration of justice.

Reviewing the statements from this perspective in the context in which they were made, we find that Judge Hocking's attempt to explain his view of the defendant's lack of malevolent purpose does not constitute misconduct.

Judge Hocking's statements were motivated by his intent to comply with *Milbourn*, on the basis of evidence he had heard at trial. They were not explicitly abusive,[18] nor do they evidence persistent misconduct. The comments were tasteless and undoubtedly offensive to the sensibilities of many citizens. They do not display a mindset unable to render fair judgment.

IV

The second charge of misconduct arising from the *Hensick* sentencing relates to the exchange between Judge Hocking and assistant prosecuting attorney Maas.

The sentencing proceeded in proper form. Ms. Maas argued first and urged that the sentence should be that recommended by the probation department; defense counsel then spoke and requested that the court deviate from the sentencing guidelines. After defense counsel's

---

[18] In *Probert*, n 17 *supra* at 236, we found misconduct in a pattern of misconduct which included the respondent's "demeaning, sarcastic remarks about the defendant's admitted homosexuality [which] made it obvious that Judge Probert sentenced him not for what he did, but for what he was."

Evidence of antagonism could, because of a protected characteristic, implicate several sections of MCR 9.205.

argument, Ms. Maas addressed the court a second time and objected to any deviation from the guidelines. Each party apparently spoke as long as they wished and neither was interrupted by the court.

When allocution had been completed, Judge Hocking began the formal pronouncement of sentence. Although the parties had scored the guidelines identically, it was immediately apparent that Judge Hocking had decided to lower the scoring. As he began to explain his justification for a lower score, Ms. Maas rose to her feet. Judge Hocking ordered Ms. Maas to sit down stating that it was his turn to speak and that Maas had a right to appeal anything she considered improper. The following colloquy ensued at this point:

> *Ms. Maas*: Your Honor, if I can just indicate: the Guidelines were not contested by Mr. McIntyre, and I had case law which I could present . . .
>
> *The Court*: I have . . .
>
> *Mr. McIntyre*: . . . to the Court.
>
> *The Court*: . . . already told you that the *Milbourne* [sic]—sit down. I'm talking, and I'm not done. And you're not going to interrupt me. If you don't like what I say, appeal.
>
> *Ms. Maas*: Your Honor, I just feel that it is my duty to bring before the Court . . .
>
> *The Court*: Fine.
>
> *Ms. Maas*: . . . additional case law . . .
>
> *The Court*: Bring it.
>
> *Mr. McIntyre*: . . . on the specific issue that . . .
>
> *The Court*: You bring it.
>
> *Ms. Maas*: . . . his Court raised before and . . .
>
> *The Court*: You bring it.
>
> *Ms. Maas*: . . . I've been denied my opportunity before this Court to raise it.
>
> *The Court*: Overruled. Sit down. The *Milbourne* case makes it very clear that whether you say anything or whether he says anything, it's my job to fashion a sentence

that is proportionate, and it's my job to talk and to make comments, suggestions, about the Michigan Sentencing Guidelines, and I'm going to do that, whether you like it or not.

The commission unanimously concurred with the master's finding, that "[u]nfortunately, in this instance, as well as in another,[19] courtesy was lost and rudeness took over."

We agree, and Judge Hocking does not dispute,[20] that he clearly lost his temper in this exchange and that he should have handled the interruption in a less acrimonious manner. As we have observed, however, every angry retort or act of discourtesy during the course of a proceeding does not amount to judicial misconduct. The facts of each instance must be evaluated separately, and a judge is only subject to discipline when the comment amounts to "conduct that is clearly prejudicial to the administration of justice . . . ." MCR 9.205(E).

Having reviewed the videotape of the *Hensick* sentencing, we find that the exchange with Ms. Maas was not clearly prejudicial to the administration of justice. Ms. Maas was given two opportunities to fully advise the court of her views on the sentence. Obviously distressed by the direction she saw the judge was taking, she interrupted the pronouncement of sentence. Lapses in decorum sometimes occur when attorneys are startled by a judge's action, and Ms. Maas' reaction is understandable. However, the interruption of

---

[19] The other instance is the exchange between Judge Hocking and attorney Elaine Sharp that we address beginning on p 21.

[20] Judge Hocking admits that he lost his temper but contends that it is only misconduct if the judge persistently fails to treat persons with respect and courtesy. See MCR 9.205(E).

sentencing was clearly a breach of the unwritten rules of courtroom etiquette, and Judge Hocking's reaction, while overly strong, is also understandable. Having been given an unlimited opportunity to present her views, Ms. Maas breached courtroom convention by interrupting the judge during the one portion of a criminal trial when by tradition and custom a judge speaks without interruption.

V

The third charge of misconduct involves conduct occurring outside a judicial proceeding that followed the *Hensick* trial. The amended complaint alleged that Judge Hocking filed an unwarranted grievance against attorney Bonnie Miller to retaliate for the request for investigation she had filed with the commission on behalf of the Livingston Area Council Against Spouse Abuse (LACASA). The request for investigation was signed by all LACASA board members, and the cover letter was signed by Ms. Miller. The complaint arose from Judge Hocking's handling of the *Hensick* sentencing.

A great deal of controversy erupted in the immediate wake of the *Hensick* sentencing. Judge Hocking's justifications for departing downward were cited in the local and national media as evidence that he was grossly deficient in gender sensitivity. Ms. Miller was a vocal critic of Judge Hocking's comments, and an interview with her appeared in a tabloid called the *Weekly World News*.[21] The *World News* article contained quotes from Ms. Miller that suggested that Judge Hocking imposed a lenient sentence because he had attended law school with the defendant's brother and that Judge Hocking delayed

---

[21] The reporter did not acknowledge that he worked for the *Weekly World News* but, rather, misled Ms. Miller by claiming to work for the *West Palm Beach Florida News,* a paper that does not exist.

ruling on the motion for a new trial in an attempt to dissuade the victim from testifying at a subsequent trial.

Asserting that the article was defamatory, Judge Hocking filed a request for investigation with the Attorney Grievance Commission. The commission notified Ms. Miller of the request for an investigation and asked that Miller file an answer. In her response, Ms. Miller explained that while she had spoken with a reporter about the case, the reporter mischaracterized her statements and inaccurately quoted her comments out of context. After reviewing Ms. Miller's response and investigating the matter further, the commission dismissed the grievance.

The master concluded, and the Judicial Tenure Commission accepted and adopted the master's conclusion, that Judge Hocking filed the grievance against Ms. Miller in retaliation for her role in filing the LACASA grievance. The commission quoted the master's finding that " 'certainly there was no basis to file such a grievance; and filing such a grievance constitutes a failure to avoid impropriety and the appearance of impropriety, in violation of the Code of Judicial Conduct, Canon 2(A).' "[22] We disagree.

A request for investigation with the Attorney Grievance Commission is a proper response to arguably defamatory statements made by attorneys. Direct response by the judge in the media is itself problematic. Regardless of the merits of the dispute, a media war of words may erode public confidence in the judiciary. Further, depending on the context and substance of a public response, the judge may expose himself to charges of ethical violations. See Canon 3A(6).[23]

---

[22] See n 24.
[23] Canon 3A(6) states:

The preponderance of the evidence does not support the conclusion that Judge Hocking filed the grievance for retaliatory purposes. The Judicial Tenure Commission found that the record "indicates that Respondent filed the grievance . . . simply to 'get even' with Ms. Miller . . . ." We find no record basis for the finding that the respondent filed the grievance to get even. To the contrary, if, as the record indicates, Judge Hocking believed that Ms. Miller recklessly made defamatory statements against him, Rule 8.3(a)[24] of the Michigan Rules of Professional Conduct  imposed on him a duty to report Ms. Miller's conduct to the Attorney Grievance Commission.

We decline to endorse the commission's implicit rationale that unless the commission finds independent justification for a grievance, the grievance was filed for retaliatory purposes. There may be situations in which the filing of a grievance is so patently frivolous as to evidence ill will on the part of the complainant. The record in this case does not present such a situation. The Attorney Grievance Commission did not treat the grievance as insufficient or patently frivolous,[25] but instead conducted an investigation. Although the commission even-

---

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require a similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court or the judge's holdings or actions.

[24] Rule 8.3(a)  states:

A lawyer having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer shall inform the Attorney Grievance Commission.

[25] MCR 9.112(C)(1)(a).

tually dismissed the grievance because Ms. Miller denied the context of the statements cited in the *Weekly World News* article, if Ms. Miller had acknowledged that the article was accurate, it is possible that the commission would have found grounds for discipline. There being no record evidence that the grievance was filed to "get even,"[26] or any basis for an inference that it was so motivated, we find no misconduct.

VI

The final charge of misconduct relates to Judge Hocking's behavior in the postjudgment custody proceedings in *McPherson v McPherson,* Eaton Circuit Court, File No. 82-409-DM. The amended complaint alleged that Judge Hocking was intemperate and abusive with respect to attorney Elaine Sharp and that he abused his contempt power.

Ms. Sharp represented the father in the proceedings and appeared before Judge Hocking on December 5, 1991, to challenge the court's previous ruling terminating joint custody. Speaking in a harsh tone, Judge Hocking quickly informed Ms. Sharp that he perceived the motion before the court as simply a disguised second motion for rehearing. He demanded to know in what way the motion was new. As Ms. Sharp attempted to argue the merits of the motion, Judge Hocking quickly interrupted her, ruled that the motion was nothing more than a motion for reconsideration, and awarded costs and attorney fees as punishment for filing a frivolous motion. The following excerpt illustrates the caustic and abusive exchange between Judge Hocking and Ms. Sharp:

---

[26] By concluding that Judge Hocking did not file the request for investigation for improper purposes, we do not reach the question whether MCR 9.125 provides absolute immunity from disciplinary proceedings as well as from civil suit.

*The Court*: I'm not going to get into the merits. I want you to tell me why this motion to reinstitute joint custody is nothing more than an attempt to rehash an order that's already been entered which was based on an evidentiary hearing. You can call it an apple if you want, but it was an evidentiary hearing. . . .

*Ms. Sharp*: All right, fine. Then tell me where the evidence was of 7.22(3)(A)? [MCL 722.23(a); MSA 25.312(3)(a).] Did you consider the love, affection, emotional ties of the parent and child?

*The Court*: All right, that's enough. Your motion to reinstitute joint custody is denied. It is nothing more than a motion for reconsideration. The filing of the motion the Court finds to be frivolous and without legal merit, and the Court awards costs and attorney fees in the form of sanctions against the attorney for the Defendant and the Defendant. If you present . . .

*Ms. Sharp*: Upon what legal basis? Would the Court kindly articulate?

*The Court*: Yes, I will, MCL 600.2591 [MSA 27A.2591].

*Ms. Sharp*: No, not for the costs but for the frivolous motion.

*The Court*: If you don't like my ruling, ma'am, the Court of Appeals awaits you.

*Ms. Sharp*: Okay, could we have an order denying custody. I've got an order here denying custody . . .

*The Court*: The only order I'm going to sign right now is an order for sanctions, costs, and . . .

*Ms. Sharp*: Are . . .

*The Court*: Don't interrupt me.

*Ms. Sharp*: Don't interrupt me.

*The Court*: Let's do it this way. That's warning number one.

*Ms. Sharp*: Are you denying it?

*The Court*: Warning number one. You get three, and then you're in contempt.

*Ms. Sharp*: All right, the Court's denying it?

*The Court*: All right, that's two.

*Ms. Sharp*: Court's denying it?

*The Court:* Yes, the Court's denying it.

*Ms. Sharp:* The Court is denying . . .

*The Court:* The Court denied your motion.

*Ms. Sharp:* To reinstitute joint custody?

*The Court:* Yes, ma'am.

*Ms. Sharp:* The Court denied it?

*The Court:* The Court denied it.

*Ms. Sharp:* Without convincing evidence?

*The Court:* Ma'am, I don't know what planet you're from.

*Ms. Sharp:* And I don't know what—you're from.

*The Court:* You're in contempt of court, and your fine is $250.

*Ms. Sharp:* You know it.

*The Court:* And you will be taken into custody, and you'll serve five days in the county jail . . .

*Ms. Sharp:* Fine.

*The Court:* . . . until you pay.

*Ms. Sharp:* Fine, then give me the newspaper reporter and give me my court attorney now.

*The Court:* You've got it, ma'am.

*Ms. Sharp:* Because you're on another planet. You're out of whack. You are totally, totally . . .

*The Court:* Take her out.

*Ms. Sharp:* Go and get the motion for—motion filed. I want the record still on, please. Let the record reflect that counsel is objecting, that there is no basis for contempt, that counsel is immediately demanding court and defense counsel and calling the newspapers.

The master concluded, and the commission affirmed, that Judge Hocking "behaved irresponsibly and injudiciously, diminishing public confidence in the judiciary in violation of CJC, Canon 2(A) and (B)." Neither the master nor the commission concluded that Judge Hocking abused his contempt authority. We agree with this conclusion.

After reviewing the audiotape of the *McPherson* hearing, it is readily apparent that Judge Hocking's behavior was shockingly injudicious. Unlike the exchange with Ms. Maas in *Hensick*, we find that Judge Hocking instigated a confrontational exchange with Ms. Sharp by challenging her to tell him why her motion was not the frivolous action he clearly had predetermined it was, made caustic comments in an abusive tone, and personally attacked Ms. Sharp, conduct that is clearly prejudicial to the administration of justice in violation of the Code of Judicial Conduct. Unlike the exchange with Ms. Maas, in which Judge Hocking was abrupt and briefly abrasive, the entire exchange with Ms. Sharp illustrates a total lack of self-control and an antagonistic mind-set predisposed to unfavorable disposition.

Attorney Sharp acted improperly in arguing the merits of the motion when she had been instructed not to do so and in continuing to argue after the court had ruled. Fortunately, such behavior is rare, but a judge has undoubted authority to control runaway behavior up to and including contempt. To hold that a trial judge may not express strong displeasure or even anger, would ignore the reality that the potential for such reactions induces a level of civility in the process, without which the system literally could not function.

However, in this incident, in which Judge Hocking also admits he was rude and discourteous, we find misconduct prejudicial to the administration of justice. We adopt the master's findings and affirm the commission's conclusions.

VII

Finally, while not charged as a separate allegation in the complaint, the master made an explicit finding that Judge Hocking's actions did not illustrate gender bias. The commission found "a strong indication of gender bias in Respondent's conduct, but since the complaint did not formally charge a pattern of gender bias, we [the Commission] make no findings in this regard."

Although evidence of gender bias certainly would be grounds for discipline,[27] we cannot conclude that the record in this case establishes such prejudice. The fact that attorneys Maas and Sharp are both women and both happen to have been the object of respondent's anger does not evidence a discriminatory pattern. We strongly suspect that had the attorneys in these situations been male, Judge Hocking would have reacted in the same fashion. Thus, because the complaint did not charge, and the evidence does not establish, gender bias, we agree that such a conclusion is inappropriate.

VIII

In assessing the appropriate sanction in judicial disciplinary proceedings, our primary charge is to fashion a penalty that maintains the honor and the integrity of the judiciary, deters similar conduct, and furthers the administration of justice. See *In re Seitz*, 441 Mich 590, 624; 495 NW2d 559 (1993).

> The purpose of judicial discipline is to protect the court system and the public it serves from unacceptable judicial

---

[27] See Canon 2B:

A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

behavior. The discipline to be imposed, then, is to be determined by the extent of the protection needed, based upon the seriousness of the judge's misconduct and the likelihood that it would recur. [*In re Disciplinary Proceedings Against Gorenstein*, 147 Wis 2d 861, 873; 434 NW2d 603 (1989).]

We must carefully maintain the distinction between protection and punishment. In disciplining Judge Hocking it is not our intention to obstruct any judge's ability to exercise judicial discretion or freedom of thought and expression, as long as such exercise does not blemish the fair administration of justice.

Although we do not condone Judge Hocking's intemperate language in addressing Ms. Maas during the sentencing proceeding, or his inept expression of his reasons for finding mitigating circumstances in the *Hensick* incident, we find that these comments, individually or in combination, do not constitute judicial misconduct. Nor can we conclude that the request for investigation filed against Ms. Miller constitutes misconduct.

The scathing attack on Ms. Sharp during the *McPherson* hearing clearly constitutes misconduct in violation of Canons 1,[28]

---

[28] Canon 1 states:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provision of this code should be construed and applied to further those objectives.

2A,[29] 2B,[30] 3A(3),[31] 3A(8)[32] of the Code of Judicial Conduct and was clearly prejudicial to the administration of justice. MCR 9.205(E).

CONCLUSION

Judges demand respect for and responsibility to the law. But respect for those who are officers of the law, on whose shoulders the consent of the governed ultimately rests, cannot be simply commanded.

Judges must be examples of responsible behavior. The process of self-mastery through which a judge strives to approach the judicial ideal requires us to exercise the power we are given over others by seeing ourselves as

---

[29] Canon 2A states:

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

[30] See n 27.

[31] Canon 3A(3) states:

A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

[32] Canon 3A(8) in pertinent part states:

Conversation between the judge and counsel in court is often necessary, but the judge should be studious to avoid controversies that are apt to obscure the merits of the dispute between litigants and lead to its unjust disposition. In addressing counsel, litigants, or witnesses, the judge should avoid a controversial manner or tone.

A judge should avoid interruptions of counsel in their arguments except to clarify their positions, and should not be tempted to the unnecessary display of learning or a premature judgment.

those who must trust us do. If the mirror we hold before us reflects a person who uses authority as an experiment in the use of power or as displacement for personal disappointment, introspection is necessary and correction is essential.

"[T]he respect due . . . judicial officers"[33] has been earned by the men and women who, for more than two-hundred years, have borne with honor and dignity the burden of bringing order to civic life in the courtrooms of our republic. Respect for the judiciary is a legacy that each generation of judges must nurture and foster in turn.

On the basis of our review of the record, we conclude that Judge Hocking's conduct in the Sharp incident merits the censure of a brief suspension. Judge Hocking is suspended without pay for three days effective the day following the date of issuance of the Court's judgment order.

BRICKLEY, C.J., and RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). I agree with much of the majority's analysis and expressly concur with parts I, II, III, IV, V, and VII. However, I would hold that Judge Hocking is not guilty of any judicial misconduct and would dismiss this case.

I agree with the majority that Judge Hocking is not guilty of any judicial misconduct with respect to the *People v Hensick*, Livingston Circuit Court, File No. 91-6537-FC, sentencing proceeding. However, I cannot agree with the majority's conclusion with respect to Judge Hocking's conduct during the *McPherson v McPherson*, Eaton Circuit Court, File No. 82-409-DM, proceeding. After listening to the audiotape of the hear-

---

[33] Oath on Admission to the Bar. SBR 15, § 3.

ing, it becomes clear from the exchange with Ms. Sharp that Judge Hocking had read her motion before taking the bench. As the majority notes, "Judge Hocking quickly informed Ms. Sharp that he perceived the motion before the court as simply a disguised second motion for rehearing." *Ante* at 20. I disagree with the majority's interpretation that Judge Hocking "instigated a confrontational exchange with Ms. Sharp . . . ." *Id.* at 23. Instead of answering Judge Hocking's question about what was "new" in this motion, Ms. Sharp continued to argue the merits. It was after her refusal to answer his question by continuing to argue the merits that Judge Hocking denied her motion. At that point, I find that Ms. Sharp's behavior became "shockingly" unprofessional.

Ideally, a judge should not instigate or engage in confrontational behavior or react to such behavior—no matter how provoked. Yet, every attorney who regularly appears before the judges of our state—judges who are forced to operate with limited resources and under great pressure from the docket—will immediately recognize that outbursts like Judge Hocking's are far from infrequent. Most judges wrestle with their self-control, and all hear motions they are predisposed against and antagonistic toward. I join the majority in wishing we could populate our courtrooms with judges devoid of temper and full of angelic patience. But if such perfect creatures exist, their planetary origin is truly unknown.

This practical observation means the Court either says today what it does not mean, or will not do tomorrow what it says today. Inevitably, the interpretation of today's new standard pressed on Judge Hocking will never be applied so stringently again. If it were, our docket would be clogged with similar cases. Judge Hocking will have been censured under a standard designed uniquely for him, a result so contrary to our role as judges that *perhaps* this holding itself is prejudi-

cial to the administration of justice, although not clearly so.

Despite our lofty expectations, some judges from time to time will stumble. From the record before me, I see evidence that Judge Hocking lost his temper only once at one attorney who was herself discourteous and contemptuous. If Judge Hocking regularly behaved this way, routinely raising his voice at advocates and closing his mind to their arguments, the administration of justice would indeed be in jeopardy. This isolated incident, although cause for concern, poses no such threat. The majority properly dismisses the allegation of misconduct during the *Hensick* proceedings because of its isolated nature. I would urge the same reasoning be applied to place the incident with Ms. Sharp in its proper perspective.

Judges play a central role in our system of justice and therefore are appropriately held to exceptionally high standards of conduct. I would emphasize that Judge Hocking's behavior should not be excused. Judges should struggle to maintain their temperament and view the cases before them unobscured by passion. When violations of this standard are drastic or repeated, we should not hesitate to censure them. But, we do the judiciary a disservice when we condemn human failings as judicial misconduct.

An isolated incident of rudeness should be identified, privately reprimanded, and hopefully prevented from recurring. Such an incident is not, however, "clearly prejudicial to the administration of justice," MCR 9.205(C)(4), and should not be the subject of any suspension from the state's highest court.

Therefore, I would reject the recommendation of the Judicial Tenure Commission.

LEVIN, J., concurred with CAVANAGH, J.