IN THE SUPREME COURT OF THE STATE OF MONTANA

No. PR 14-0078

2014 MT 149

———————————

| | | |
|---|---|---|
| INQUIRY CONCERNING COMPLAINT OF JUDICIAL STANDARDS COMMISSION OF THE STATE OF MONTANA, | ) ) ) ) | |
| Complainant, | ) ) | O P I N I O N and |
| v. | ) ) | O R D E R |
| JUDGE G. TODD BAUGH, | ) ) ) | |
| Respondent. | ) | |

———————————

¶1    This matter comes before the Court on a formal complaint filed by the Judicial Standards Commission against Montana District Court Judge G. Todd Baugh. Judge Baugh has waived formal proceedings before the Commission, admitted that he violated Montana's Code of Judicial Conduct, and consented to judicial discipline by this Court. The Commission has filed with the Court its recommendation that the Court accept Judge Baugh's acknowledgement of violation, waiver of formal proceedings, and consent to discipline in the form of public reprimand or censure. The Commission further recommends that this Court publicly censure Judge Baugh for the conduct set forth in the formal complaint filed against him.

## BACKGROUND

¶2    This judicial disciplinary matter arises from Judge Baugh's August 2013 sentencing of Stacey Rambold for the crime of sexual intercourse without consent. Unless otherwise

noted below, the following facts are taken from the formal disciplinary complaint filed against Judge Baugh.

¶3     In October of 2008, the State of Montana charged Rambold, a 47-year-old teacher at Billings Senior High School, with sexual intercourse without consent with a 14-year-old high school freshman. Tragically, the victim committed suicide in early 2010—before the legal proceedings against Rambold had been completed. Later that year, the State agreed to defer prosecution of Rambold in exchange for his admission to having committed one count of sexual intercourse without consent, and his agreement to enter sex offender treatment. Under the agreement, if Rambold violated the conditions of his sex offender treatment, his prosecution could be reinstated. Judge Baugh, a district judge of the Montana Thirteenth Judicial District Court, Yellowstone County, approved the deferred prosecution agreement.

¶4     Rambold was terminated from his sex offender treatment program for failure to properly participate in the program, for having unauthorized contact with minor children (relatives), and for engaging in sexual relationships with adult women and failing to disclose those relationships to his treatment team and group. Upon learning of these violations, the State reinstated Rambold's prosecution.

¶5     On April 15, 2013, the State and Rambold entered into a plea agreement under which Rambold agreed to plead guilty to one count of sexual intercourse without consent. The State sought a sentence of 20 years in prison with 10 years suspended. Rambold, through counsel, asked that all but 30 days of his sentence be suspended.

¶6     On August 26, 2013, Rambold appeared before Judge Baugh for sentencing. Before imposing sentence, Judge Baugh spoke from the bench about his rationale for the sentence

he was about to impose. Among other things, Judge Baugh stated Rambold's victim was "a troubled youth, but a youth that was probably as much in control of the situation as [Rambold], one that was seemingly, though troubled, older than her chronological age." Judge Baugh then sentenced Rambold to 15 years in the Montana State Prison with all but 31 days suspended and with credit for one day served. Judge Baugh later explained to members of the press that "[i]t was horrible enough as it is just given her age, but it wasn't this forcible beat-up rape."

¶7 Judge Baugh's sentence and rationale, particularly his remarks that the 14-year-old victim was "older than her chronological age" and "as much in control of the situation" as her 47-year-old teacher, sparked immediate public outcry.[1] The Judicial Standards Commission began receiving hundreds of complaints against Judge Baugh and, in total, eight verified complaints were filed with the Commission. In addition, shortly after sentencing, Judge Baugh sought to modify Rambold's sentence, apparently having concluded that, under § 46-18-205, MCA, the mandatory minimum sentence for Rambold's crime was two years in prison. We blocked Judge Baugh's attempt to resentence Rambold, on grounds that he lacked authority to revise a sentence he had already issued. He nevertheless held a hearing, at which he made additional public remarks on the case and his actions in it.[2]

---

[1] *See e.g.* Matt Pearce, *Hundreds Rally Against Montana Judge in Rape-Suicide Case*, L.A. Times, Aug. 29, 2013, available at http://articles.latimes.com/2013/aug/nation/la-na-nn-montana-rally-20130829.

[2] *See* Greg Tuttle, *Baugh addresses media at unusual hearing in Rambold rape case*, billingsgazette.com, Sept. 6, 2013, available at http://billingsgazette.com/news/local/crime-and-courts/baugh-addresses-media-at-unusual-hearing-in-rambold-rape-case/article_719fe5f8-78da-5878-bc89-148dcf0cf42a.html.

¶8 The State appealed the criminal case against Rambold. We recently vacated his sentence and remanded for resentencing by a new judge. *See State v. Rambold*, 2014 MT 116, 375 Mont. 30, ___ P.3d ___.

## DISCUSSION

¶9 Rule 1.2 of the Code of Judicial Conduct requires judges to act in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and avoids impropriety or the appearance of impropriety. Judge Baugh has admitted that he violated that rule.

¶10 The comments to Rule 1.2 state, in relevant part, that public confidence in the judiciary is eroded by improper conduct and conduct that creates the appearance of impropriety. A judge should expect to be the subject of public scrutiny that might be viewed as burdensome if applied to other citizens. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated the Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.

¶11    Judge Baugh's comments in open court in this case disregarded longstanding Montana law that a person under the age of 16 is legally incapable of consenting to sexual intercourse. His assertion that the victim was "older than her chronological age" is inconsistent with Montana law categorizing child victims of sexual offenses based on their chronological age alone, rather than on subjective perceptions of physical maturity and situational control. In addition, Judge Baugh's later attempt to retract his sentence and rationale was inconsistent with Montana law. Finally, Judge Baugh made additional inappropriate public statements attempting to justify his actions. Through his unlawful sentence, inappropriate rationale, and subsequent public comments, Judge Baugh has eroded public confidence in the judiciary and created an appearance of impropriety, therefore violating the Montana Code of Judicial Conduct. He has caused Montana citizens, as well as others, to question the fairness of our justice system and whether prejudice or bias affected the outcome of the Rambold case. There is no place in the Montana judiciary for perpetuating the stereotype that women and girls are responsible for sexual crimes committed against them.

¶12    Article VII, section 11(3) of the Montana Constitution and § 3-1-1107, MCA, allow this Court, upon recommendation of the Judicial Standards Commission, to impose discipline upon any Montana judge for violation of the Code of Judicial Conduct. We adopt the recommendation of the Judicial Standards Commission that we accept Judge Baugh's admission that his actions violated the Code of Judicial Conduct and his consent to submit himself to this Court for public censure.

¶13    In addition, we conclude that Judge Baugh's actions warrant his suspension without pay for 31 days. Judge Baugh's current term in office expires December 31, 2014. He has

announced that he will not seek reelection to another term. In light of those facts and in order to minimize the impact of his suspension on the parties whose cases are pending before him and on the other judges in the Thirteenth Judicial District, we conclude the suspension should commence on December 1, 2014.

¶14 Because Judge Baugh has not consented to a suspension, and because the Commission has not recommended suspension, we will allow Judge Baugh 15 days from the date of this Opinion and Order in which to withdraw his consent to discipline.

¶15 IT IS ORDERED that Judge Baugh is granted until June 19, 2014, in which to withdraw his consent to judicial discipline, in writing filed with the Clerk of this Court. If Judge Baugh withdraws his consent to judicial discipline, the Court will return this matter to the Judicial Standards Commission for formal proceedings.

¶16 IT IS FURTHER ORDERED that, if Judge Baugh does not withdraw his consent to discipline, he shall appear before this Court in our courtroom in Helena, Montana, at 9:30 a.m. on July 1, 2014, for the delivery of a public censure by this Court.

¶17 IT IS FURTHER ORDERED that, if Judge Baugh does not withdraw his consent to discipline, he will be suspended from the bench without pay for a period of 31 days beginning on December 1, 2014.

DATED this 4th day of June, 2014.

/S/ MIKE McGRATH

6

We Concur:

/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE


Justice Laurie McKinnon, dissenting.

¶18    "[N]either laws nor the procedures used to create or implement them should be secret; and . . . the laws must not be arbitrary."[1] Public confidence in the judiciary, which is at issue in these proceedings, depends on laws that are predictably and uniformly applied. I cannot agree, therefore, with this Court's decision to impose a sanction more severe than the one recommended by the Judicial Standards Commission when we have not articulated a single rule, standard, or analysis justifying this decision. In rejecting the Commission's recommendation, the Court fails to set forth a standard of review and fails to articulate any factors or objectives that guide our determination to impose a particular sanction. Our decision today may be viewed by some as arbitrary and predicated solely upon the personal opinion of any particular Justice. As a result, we have ultimately exacerbated the breach in public confidence initially wrought by Judge Baugh.

¶19    Because public confidence in the judiciary is earned through decisions that are transparent and nonarbitrary, this Court's decisions must demonstrate that our discretion has been exercised in an evenhanded and uniform manner, to the extent humanly possible. Public confidence is restored only if the remediating court arrives at its decision as a neutral

---

[1] Diane P. Wood, *The Rule of Law in Times of Stress*, 70 U. Chi. L. Rev. 455, 457 (2003).

7

and independent arbiter and through the application of clear and articulable standards. The old Latin question, "Quis custodiet ipsos custodes?" (Who guards the guardians?) implies that in a society governed by laws, rather than by individuals, someone must guard the guardians—or else, ultimately, there is nothing but the rule of men.[2] Standards of review, identifiable factors and objectives for imposing sanctions, and a review limited to the record before us are checks on the potentially unfettered discretion of this Court. Because we have failed to articulate these standards and rules in today's Opinion, and thus have strayed from fundamental principles of American jurisprudence, I dissent.

### Standard of Review

¶20 Montana regulates judicial conduct through a system involving both this Court and the constitutionally created Judicial Standards Commission. Article VII, Section 11 of the Montana Constitution provides for the removal and discipline of judges and directs the Legislature to create a judicial standards commission to investigate complaints of judicial misconduct. In accordance with this provision, the Legislature created the Judicial Standards Commission consisting of five members: two district court judges, who are elected by the district judges; one attorney, appointed by the Supreme Court, who has practiced law in this State for at least ten years; and two citizens, appointed by the Governor, who are not attorneys or judges. Section 3-1-1101, MCA. Other provisions in Title 3, chapter 1, part 11,

---

[2] As James Madison noted, "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself." *The Federalist* No. 51, at 320 (Isaac Kramnick ed., 1987).

MCA, set out the procedures and authority of the Commission and provide for action by this Court.

¶21 The Constitution directs the Judicial Standards Commission to "make rules implementing this section." Mont. Const. art. VII, § 11(2). Pursuant to this authority, the Commission has adopted the Rules of the Judicial Standard Commission (hereinafter, "Rule ___"). Under these rules, the Commission investigates allegations of judicial misconduct upon receipt of a complaint or on the Commission's own motion. Rule 10(b), (c). Based on its investigation, the Commission may summarily reject or dismiss a complaint because it "fail[s] to state any possible grounds for disciplinary proceedings." Rule 10(e), (f). If there is cause to proceed,[3] the investigation may result in the filing of a formal complaint. Rule 11(a). The judge who is the subject of the proceedings is entitled to discovery, Rule 12(f); to a formal hearing, Rule 13(a)-(f); and to a majority decision of the Commission before a sanction may be recommended to this Court, Rule 13(h). The Commission and the judge may, at any time, agree to a particular disposition of the matter. Rule 10(h).

¶22 As an alternative to dismissing a complaint or filing formal charges, the Commission may impose an informal sanction without any involvement by this Court. Rule 10(g) states that, after receipt of a complaint and before voting to hold a formal hearing, the Commission "may delegate to one or more of its members the authority and responsibility to personally and confidentially confer with the judge subject to the inquiry, and to make informal

---

[3] The Rules do not set forth the level of scrutiny—such as reasonable grounds, probable cause, or some other standard—required in evaluating the allegations of the complaint.

recommendations to the judge concerning the subject matter of the inquiry and a satisfactory disposition thereof." If the judge agrees to the Commission's suggested disposition, the matter may be disposed of on the basis of the agreement reached. Rule 10(g).

¶23 Rule 9(c) authorizes eight different sanctions that the Commission "may impose, or recommend to the Supreme Court": (1) private admonition by the Commission; (2) private reprimand by the Commission; (3) public reprimand by this Court; (4) censure by this Court;[4] (5) temporary suspension by this Court; (6) removal by this Court; (7) permanent removal by this Court, with a declaration that the person may never again hold a judicial office in Montana; and (8) retirement, imposed by this Court, for a permanent disability that seriously interferes with the performance of judicial duties. Although the Commission "may admonish or privately reprimand a judge with or without a formal complaint being filed," any other sanction must be administered by this Court "after completion of a proceeding on a formal complaint, and recommendation to the Supreme Court." Rule 9(d). The grounds for discipline or removal are set forth in Rule 9(b). Of relevance to this case, one of those grounds is "[v]iolation of the Canons of Judicial Ethics adopted by the Supreme Court of the State of Montana, which may include conduct prejudicial to the administration of justice which brings the judicial office into disrepute, or impropriety." Rule 9(b)(4).

---

[4] The Commission distinguishes public reprimand from censure as follows. "*Public Reprimand:* A public reprimand administered by the Supreme Court, upon report and recommendation of the commission, which declares a judge's conduct unacceptable under one of the grounds for judicial discipline but not so serious as to warrant a censure." Rule 9(c)(3). "*Censure:* A public declaration by the Supreme Court that a judge is guilty of misconduct that does not require suspension or removal from office. Censure may be ordered in conjunction with other sanctions." Rule 9(c)(4).

10

¶24 This Court's role in judicial misconduct proceedings is specified in the Montana Constitution and by statute. The Constitution provides as follows:

> (3) Upon recommendation of the commission, the supreme court may:
> (a) Retire any justice or judge for disability that seriously interferes with the performance of his duties and is or may become permanent; or
> (b) Censure, suspend, or remove any justice or judge for willful misconduct in office, willful and persistent failure to perform his duties, violation of canons of judicial ethics adopted by the supreme court of the state of Montana, or habitual intemperance.

Mont. Const. art. VII, § 11(3). Section 3-1-1107, MCA, further provides:

> (1) The supreme court shall review the record of the proceedings and shall make such determination as it finds just and proper and may:
> (a) order censure, suspension, removal, or retirement of a judicial officer; or
> (b) wholly reject the [Commission's] recommendation.
> (2) Any hearing conducted before the supreme court relative to a recommendation by the commission, together with all papers pertaining to such recommendation, shall be accessible to the public.

¶25 This Court has had limited opportunities to review the functions of the Commission and, as far as I am able to ascertain, has never rejected a recommendation of the Commission. While our statutory authority allows us to make such determination as we find "just and proper," § 3-1-1107(1), MCA, there is no reference in the Constitution, the applicable statutes, or the governing rules as to the standard of review upon which we should assess Commission recommendations. The Commission must apply the "clear and convincing evidence" standard of proof when evaluating evidence presented in support of a formal complaint, Rule 13(e), but the weight we must give the Commission's findings and recommendations has never been articulated by this Court. What standard of review to apply, however, is necessarily the first question that should be addressed by the Court as it

11

begins its decision-making process. Invoking the incorrect standard of review, or no standard of review as we have done here, potentially leads to a faulty and incorrect decision.

¶26 I note that the high courts of many other states have considered the appropriate standard of review to apply in proceedings of this nature. The reasoning of those courts, together with the Montana constitutional and statutory provisions governing judicial misconduct proceedings, leads me to conclude that a special form of "de novo" review applies to our review of Commission recommendations. Setting aside its power to dismiss a complaint or to resolve a complaint through private admonishment or reprimand, the Commission's authority is limited to making a *recommendation* to this Court for a particular sanction or disposition. Mont. Const. art. VII, § 11(3); § 3-1-1106(3), MCA; Rule 9(c), (d). "[T]he term 'recommend' manifests an intent to leave the court unfettered in its adjudication." *In re Brown*, 512 S.W.2d 317, 320 (Tex. 1974); *accord In re Disciplinary Proceeding Against Deming*, 736 P.2d 639, 642 (Wash. 1987) (stating this principle and concluding that the court's review is "de novo"). Indeed, the authority to ultimately censure, suspend, remove, or retire the judge is entrusted to this Court alone, Mont. Const. art. VII, § 11(3), and we are entitled to "wholly reject" the Commission's recommendation, § 3-1-1107(1)(b), MCA. We are required to "review the record of the proceedings" and to make such determination as we find "just and proper." Section 3-1-1107(1), MCA. In exercising that authority, we must make our own independent evaluation of the record evidence adduced in the proceedings before the Commission.

¶27 The term "de novo" carries somewhat different implications depending on the context. In an appeal to a district court from a justice court that is not a court of record, the

district court must try the case "de novo." *McDunn v. Arnold*, 2013 MT 138, ¶ 12, 370 Mont. 270, 303 P.3d 1279. "A trial 'de novo' means trying the matter anew, the same as if it had not been heard before and as if no decision had been previously rendered." *McDunn*, ¶ 22 (alteration and some internal quotation marks omitted). Such de novo review certainly would not apply here, as this Court does not try the matter "as if it had not been heard before and as if no decision had been previously rendered." The rules do not provide for this Court to receive evidence and conduct hearings on the formal complaint. We instead "review the record of the proceedings" that occurred before the Commission. Section 3-1-1107(1), MCA.

¶28 In the context of reviewing a district court's summary judgment ruling, we have stated that "de novo review affords no deference to the district court's decision and we independently review the record, using the same criteria used by the district court to determine whether summary judgment is appropriate." *Siebken v. Voderberg*, 2012 MT 291, ¶ 20, 367 Mont. 344, 291 P.3d 572. Affording "no deference" to the Commission's recommendation, however, would be improper for two reasons.

¶29 First, it must be remembered that, at the summary judgment stage, the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses. The court merely examines the record to determine whether there is a genuine issue as to any material fact relating to the legal issues raised and, if there is not, whether the moving party is entitled to judgment as a matter of law on the undisputed facts. *Andersen v. Schenk*, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675. On appeal, this Court "has access to the same facts and can put itself in the same position as the district court

13

judge when reviewing his or her purely legal rulings." *Cole v. Valley Ice Garden, LLC*, 2005 MT 115, ¶ 4, 327 Mont. 99, 113 P.3d 275.

¶30    In contrast, the Commission's recommendation to this Court typically follows a formal hearing where witnesses may testify and evidence is introduced. Rules 9(d), 13. Unlike a summary judgment proceeding, the Commission must weigh the evidence, choose one disputed fact over another, evaluate the credibility of witnesses, and make findings of fact. Unlike this Court, the Commission is in the unique position of observing the demeanor of witnesses (if any), assessing their credibility, and deciding the weight of their testimony. Thus, deference should be given to the Commission's determinations in this regard. *See In re Disciplinary Proceeding Against Anderson*, 981 P.2d 426, 432 (Wash. 1999) ("In evaluating the evidence, we necessarily give considerable weight to credibility determinations by the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor."); *In re Disciplinary Action Against McGuire*, 2004 ND 171, ¶ 6, 685 N.W.2d 748 ("Although our review is de novo, we accord due weight to the hearing body's findings because the hearing body had the opportunity to observe the demeanor of the witnesses.").

¶31    Second, the Commission is a constitutionally established body uniquely composed of two judges, one attorney, and two citizens who are neither judges nor attorneys. Mont. Const. art. VII, § 11(1). The Commission is specially tasked with the investigation and adjudication of alleged judicial misconduct. Mont. Const. art. VII, § 11(2); § 3-1-1106, MCA. Under the framework outlined in Article VII, Section 11, this Court's power to impose a particular sanction is contingent on the Commission having so recommended.

Mont. Const. art. VII, § 11(3). As the Michigan Supreme Court observed regarding that state's Judicial Tenure Commission (JTC):

> As a constitutionally created state agency charged with making recommendations to this Court concerning matters of judicial discipline, the JTC is entitled, on the basis of its expertise, to deference both with respect to its findings of fact and its recommendations of sanction. However, such deference cannot be a matter of blind faith, but rather is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline.

*In re Brown*, 625 N.W.2d 744, 744 (Mich. 2000); *see also In re Kelly*, 238 So. 2d 565, 571 (Fla. 1970) ("In view of these constitutional provisions prescribing the composition of the Commissions, its findings should be given great weight."); *In re Robson*, 500 P.2d 657, 659-60 (Alaska 1972) ("Normally considerable weight will be accorded to a given recommendation from the commission, if supported by an adequate factual basis.").

¶32 Based on the foregoing discussion, I would hold that our review of a Commission recommendation, and any underlying findings or conclusions, should be based on our own independent evaluation of the evidence—a de novo review of the record.[5] At the same time, however, I believe we must give due weight to the Commission's findings and recommendation, particularly to the extent those are premised on the Commission's expertise or its assessment of witness credibility. *See In re Johnstone*, 2 P.3d 1226, 1234-35 (Alaska 2000); *Kennick v. Commn. on Jud. Performance*, 787 P.2d 591, 598 (Cal. 1990); *Schirado*, 364 N.W.2d at 52.

---

[5] This approach is followed by various other courts. *See e.g. In re Hanson*, 532 P.2d 303, 315-16 (Alaska 1975); *Geiler v. Commn. on Jud. Qualifications*, 515 P.2d 1, 4 (Cal. 1973); *Kelly*, 238 So. 2d at 571; *In re Diener*, 304 A.2d 587, 594 (Md. 1973); *Jud. Qualifications Commn. v. Schirado*, 364 N.W.2d 50, 52 (N.D. 1985).

¶33 Having addressed what I believe is the appropriate standard of review, no other conclusion can be reached but that an independent, de novo review of the record supports a finding that Judge Baugh violated Rule 1.2 of the 2008 Montana Code of Judicial Conduct. This rule concerns "Promoting Confidence in the Judiciary." Judge Baugh has acknowledged his violation of this rule, and his acknowledgement serves as conclusive evidence, in light of the averments in the Formal Complaint, that he failed to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary" and failed to "avoid . . . the appearance of impropriety." Mont. Code Jud. Conduct R. 1.2. Having determined that the violation was established by clear and convincing evidence—consisting of Judge Baugh's admission—the matter remains of what sanction to impose.

**Sanction**

¶34 There are three matters which bear on the question of an appropriate sanction: factual considerations relating to the judge and the transgression; the goals and objectives of imposing a sanction; and the distinction between judicial misconduct on one hand, and legal error or an abuse of discretion on the other. I believe the Court's Opinion is deficient in failing to articulate and address these considerations.

¶35 First, the Montana Code of Judicial Conduct suggests factors that should guide our consideration of a sanction. It states:

> Whether discipline should be imposed should be determined through a reasonable and reasoned application of the Rules, and should depend upon factors such as the seriousness of the transgression, the facts and circumstances that existed at the time of the transgression, the extent of any pattern of improper activity, whether there have been previous violations, and

16

the effect of the improper activity upon the judicial system or others.

Mont. Code. Jud. Conduct, Scope, ¶ 6.

¶36 Similarly, factors in determining the appropriateness of a sanction have also been addressed by courts in other jurisdictions, and there exists a well-recognized body of caselaw on this subject. The New Hampshire Supreme Court, for example, considered various approaches before settling on the following five factors: (1) the nature of the misconduct; (2) the extent of the misconduct; (3) the judge's culpability; (4) the judge's conduct in response to the commission's inquiry and the commencement of disciplinary proceedings; and (5) the judge's reputation and record on the bench. *In re Coffey's Case*, 949 A.2d 102, 115 (N.H. 2008) (citing Cynthia Gray, *American Judicature Society: A Study of State Judicial Discipline Sanctions* 81-82 (2002)). The Washington Supreme Court has set forth a list of ten factors commonly referred to as the *Deming* factors:

> To determine the appropriate sanction, we consider the following nonexclusive factors: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

*Deming*, 736 P.2d at 659. The *Deming* factors are frequently cited by other courts. *See In re Jett*, 882 P.2d 414, 419 (Ariz. 1994); *Jud. Disc. & Disability Commn. v. Thompson*, 16 S.W.3d 212, 226 (Ark. 2000); *In re Inquiry Concerning McCormick*, 639 N.W.2d 12, 16 (Iowa 2002); *In re Chaisson*, 549 So. 2d 259, 266 (La. 1989); *In re Hathaway*, 630 N.W.2d

17

850, 860 n. 13 (Mich. 2001); *Miss. Commn. on Jud. Performance v. Skinner*, 119 So. 3d 294, ¶¶ 31-32 (Miss. 2013); *In re Disciplinary Action Against McGuire*, 2004 ND 171, ¶ 33, 685 N.W.2d 748; *In re Singletary*, 967 A.2d 1094, 1101-02 (Pa. Ct. Jud. Disc. 2008); *In re Rose*, 144 S.W.3d 661, 733 (Tex. Rev. Trib. 2004).

¶37    Second, also significant to the determination of a sanction is the accepted principle that "[the] goal in imposing sanctions is to protect the public and foster judicial integrity—not to punish." *In re McVay*, 158 P.3d 198, ¶ 9 (Ariz. 2007) (internal quotation marks omitted); *see also McComb v. Commn. on Jud. Performance*, 564 P.2d 1, 5 (Cal. 1977) ("The ultimate objective is to protect the judicial system and the public which it serves from judges who are unfit to hold office."); *In re Inquiry Concerning a Judge*, 788 P.2d 716, 722 (Alaska 1990) ("Because the purpose of judicial discipline is to protect the public rather than punish the individual judge, the proceeding is neither civil nor criminal but *sui generis*."). The public may be protected in several ways.  One way is to remove the offending judge from office.  Another is to keep the public informed that its judiciary actively investigates allegations of judicial misconduct and takes appropriate action when the allegations have been proved.  "Judicial discipline thus protects the public by fostering public confidence in the integrity of a self-policing judicial system." *Johnstone*, 2 P.3d at 1234.

¶38    Nevertheless, although punishment itself is not a goal of the process, imposing sanctions on an offending judge does have "punitive effects." *Johnstone*, 2 P.3d at 1234. The punitive aspect of judicial discipline serves: to discourage further misconduct on the part of the disciplined judge and the judiciary as a whole; to reinforce the perception that judicial ethics are important; and to promote public confidence by demonstrating that the judicial

18

system takes misconduct seriously. Punishment is a means of achieving these goals, but it is not an end in itself. *Johnstone*, 2 P.3d at 1234. Thus, courts have recognized that punishment may have an indirect role in imposing a sanction. *See e.g. In re Probert*, 308 N.W.2d 773, 776 (Mich. 1981); *In re Kneifl*, 351 N.W.2d 693, 700 (Neb. 1984); *In re Eastburn*, 914 P.2d 1028, 1035 (N.M. 1996).

¶39 As the foregoing caselaw reflects, determining the appropriate sanction requires a fact-intensive analysis based on generally applicable factors, and the sanction must be aimed at protecting the public and fostering judicial integrity, not punishing the specific judge. Critical to restoring public confidence in the judiciary is transparency in our decision-making, which necessitates that we identify those factors and objectives that guide our discretion in choosing to reject the Commission's recommendation. The Court, however, has failed to articulate any factors or objectives—such as those set forth in the Montana Code of Judicial Conduct, those set forth in *Deming*, or some other set of factors—which have guided its discretion. In my view, the Court's decision is deficient in its failure to consider, or even set forth, relevant considerations affecting the sanction to be imposed. A fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently. Without standards, factors, and objectives guiding our consideration, we are left to make a decision in a legal vacuum, deciding whether a given sanction strikes us, by our own consciences, as commensurate with the wrongdoing. I, myself, am uncomfortable with rendering such an arbitrary decision. I believe this Court should not be guided by what might seem like "the right thing to do." We cannot render fair decisions without employing guidelines, reason, or the law in our analysis.

19

¶40     Of course, our review is limited to the record created in the proceedings before the Commission, § 3-1-1107(1), MCA, and that record in the present case is rather meager due to Judge Baugh's waiver of formal proceedings. We have the averments of the Formal Complaint filed by the prosecuting attorney, and the admissions in Judge Baugh's responses to the allegations. But there is no testimony or evidence to review. Thus, the record before us contains no information regarding such factors as whether there has been a pattern of improper activity and whether there have been previous violations. The record does not establish Judge Baugh's tenure and contribution to the bench and bar, and whether there have been prior complaints or discipline imposed. This does not mean, however, that our determination of the proper sanction need not be based on articulated factors and objectives. Indeed, identifying those factors and objectives is crucial to ensuring that a proper record is made by the Commission in the first place.

¶41     Finally, the third matter relevant to our imposition of a sanction is the distinction between judicial misconduct and errors of law. Matters involving legal error or the exercise of judicial discretion, particularly in the context of sentencing, are outside the function of the Commission and within the appellate jurisdiction of this Court. In other words, a complaint that a judge misapplied the law or abused his or her discretion is properly addressed by an appeal to this Court, not a proceeding before the Judicial Standards Commission. "[G]enerally, a judge is not subject to discipline for 'appealable errors of law or abuses of discretion,' and '[j]udicial error alone is not a sufficient basis upon which to found violations of the Code of Judicial Conduct.'" *In re Hocking*, 546 N.W.2d 234, 239 (Mich. 1996) (second brackets in original, citations omitted).

20

¶42 Nevertheless, although legal error or an abuse of discretion does not in itself constitute judicial misconduct, judicial misconduct creating the need for discipline may arise from the same source as judicial conduct that is within the scope of appellate review. *In re Inquiry Concerning Lichtenstein*, 685 P.2d 204, 209 (Colo. 1984); *In re Laster*, 274 N.W.2d 742, 745 (Mich. 1979). The important distinction is that appellate review seeks to correct erroneous legal rulings prejudicial to a particular party, while disciplinary action seeks to prevent potential prejudice to future litigants and the judicial system itself. *Lichtenstein*, 685 P.2d at 209; *Laster*, 274 N.W.2d at 745. Consistent with this distinction, the Montana Code of Judicial Conduct recognizes that the rules set forth therein "should not be interpreted to impinge upon the essential independence of judges in making judicial decisions." Mont. Code. Jud. Conduct, Scope, ¶ 5. If every error of law or abuse of discretion subjected a judge to both reversal and discipline, the independence of the judiciary would be threatened.

¶43 There is ample caselaw in which a judge's comments made during sentencing have been evaluated in the context of judicial misconduct proceedings. Three of these cases are useful in addressing the issue now before this Court. First, in *Lichtenstein*, the Colorado Supreme Court rejected a recommendation that a judge be publicly reprimanded for statements he made during sentencing of a man for the second-degree murder of his wife. In explaining why he was imposing a four-year suspended sentence, the judge observed that the defendant's "heat of passion" had been

> "caused by a series of highly provoking acts on the part of the victim of leaving him without any warning; . . . in a sense deceiving him as to her intentions by being extremely loving and caring up to and through the morning that she left the family home with the full intention of obtaining a divorce and proceeding with a separation from him without even giving him any

21

knowledge of her whereabouts or that of their son."

*Lichtenstein*, 685 P.2d at 206. These comments and the suspended sentence generated extensive publicity, and a formal complaint was filed. The state Commission on Judicial Discipline found that the judge's remarks violated the Colorado Code of Judicial Conduct "by bringing the judiciary into disrepute and undermining public confidence in the integrity and impartiality of the judiciary." *Lichtenstein*, 685 P.2d at 207.

¶44 The Colorado Supreme Court ultimately determined that the sentence was illegal and remanded for resentencing. *Lichtenstein*, 685 P.2d at 206 n. 7. The court concluded, however, that there was no judicial misconduct. Emphasizing the need to evaluate the judge's remarks in context, and noting that the judge was required by statute to make specific findings on the record detailing the circumstances which justified a departure from the presumptive sentence, the court reasoned:

> Judge Lichtenstein's remarks were made in an effort to place on record the extraordinary mitigating circumstances that he believed justified a sentence below the presumptive sentence of eight to twelve years applicable to second degree murder. The judge was attempting to describe how the victim's conduct, as perceived and interpreted by the defendant, brought about an emotional state in the defendant similar to the "irresistible passion" required for voluntary manslaughter. Although the sentencing comments contain some phraseology which, when read in isolation, might have offended the sensibilities of others, the full context of the sentencing hearing indicates that the choice of words was no more than an awkwardly executed effort to place on record the confused and highly emotional state of the defendant at the time of the killing, which, in the judge's opinion, constituted a mitigating circumstance justifying a sentence below the presumptive range. The judge's comments were not intended to be disrespectful of the law, the victim, or anyone else; nor do they reasonably lend themselves to such a connotation in the full context of the hearing. We thus conclude that the judge's remarks were not such as to bring the judiciary into disrepute or to undermine public confidence in the integrity or impartiality of the judicial system . . . .

22

*Lichtenstein*, 685 P.2d at 209 (footnote omitted).

¶45    Similarly, in *Hocking*, the Michigan Supreme Court rejected a recommendation that a judge be sanctioned for improper remarks made during sentencing on a rape conviction. The defendant, an attorney, had orally and digitally penetrated a woman he was representing in divorce proceedings. Although rejecting the defense's motion for a directed verdict, the trial judge observed that "this was the weakest criminal case that resulted in a conviction that I've ever seen." *Hocking*, 546 N.W.2d at 238 n. 12. The judge thus imposed a sentence that deviated significantly downward from the sentencing guidelines. He identified, as mitigating factors, evidence that "the Defendant helped the victim up off the floor after the occurrence," that "the victim told a spouse-abuse agency the sex was not forced but . . . her resistance was worn down by the Defendant's persistent request," and that "the victim agreed to the Defendant's 2:00 a.m., Sunday morning visit." *Hocking*, 546 N.W.2d at 239 (internal quotation marks omitted). The third remark was interpreted to mean that a lesser sentence was appropriate because "the victim asked for it." *Hocking*, 546 N.W.2d at 239. The state Judicial Tenure Commission found that these statements were "bizarre" and "showed a certain obvious lack of sensitivity towards the feeling of women generally," and recommended that the judge be suspended from judicial office for thirty days without pay. *Hocking*, 546 N.W.2d at 237, 239 n. 14 (internal quotation marks omitted).

¶46    In reviewing the judge's comments, the Michigan Supreme Court began its analysis with the principle, noted above, that judicial error alone is not a sufficient basis upon which to found violations of the Code of Judicial Conduct. *Hocking*, 546 N.W.2d at 239. The court thus observed that "Judge Hocking is not subject to discipline for his decision to depart

23

downward on the basis of the facts of the case. Relief for unjustified departure, if warranted, is available through appeal." *Hocking*, 546 N.W.2d at 239. Acknowledging that a judicial officer is not immune from discipline for *the manner* in which a decision is articulated, the court then observed:

> It is clear, however, that every graceless, distasteful, or bungled attempt to communicate the reason for a judge's decision cannot serve as the basis for judicial discipline. We are committed to eradicating sexual stereotypes, but we cannot ignore the cost of censoring inept expressions of opinion. The commission's contention that Judge Hocking's comments were "rife with remarks revealing his frustration with the jury verdict and his sympathy for the defendant" illustrates the problem.
>
> Judge Hocking was obviously straining to find ground to justify a reduced sentence. However, disagreement with a jury verdict is not improper, and sympathy for a defendant a judge believes to have been wrongfully convicted is not inappropriate. The rationale for a severe sentence would inevitably have a negative effect on those who disagree with the verdict, and "sympathetic" remarks would have a negative effect on those who believed the verdict was correct. In short, we would discourage honest explanation of the rationale for tailoring sentences to the offender and the offense were we to define misconduct from the perspective of the person most sensitive to such remarks.

*Hocking*, 546 N.W.2d at 240.

¶47    In contrast, the New Jersey Supreme Court adopted a recommendation that a judge be publicly reprimanded for making statements at sentencing that expressed a stereotypical view regarding the sexual nature of young boys. *In the Matter of Bruce A. Gaeta*, No. ACJC 2002-171 (N.J. Advisory Comm. on Jud. Conduct), *adopted*, *In the Matter of Bruce A. Gaeta*, No. D-140 (N.J. May 7, 2003). The defendant was a former teacher who had pleaded guilty to second-degree sexual assault involving her 13-year-old male student. In the plea agreement, the defendant agreed to a sentence of three years' incarceration; however, the judge sentenced her to probation. In imposing this sentence, the judge opined: "'Maybe it

24

was a way of [the victim] to, once this did happen, to satisfy his sexual needs. At 13, if you think back, people mature at different ages. We hear of--newspapers and t.v. reports over the last several months of nine-year-olds admitting having sex.'" *Gaeta* at 5-6. The judge related that when he was serving as a prosecutor and was looking around the courtroom for the fifteen-year-old girl who was the victim of an assault, "'he was surprised to see someone 'who looks like she's twenty-five-years old,' adding that the defendant in that case stated '[he] had no idea until later on. Well, too bad. The law said you violated the statute.'" *Gaeta* at 6 (brackets in original).

¶48 The state Advisory Committee on Judicial Conduct found that the judge's remarks expressed stereotypical views regarding the sexual nature of young boys. *Gaeta* at 8. The Committee observed that the law criminalizing sexual activities between an adult and a minor is strongly based on the understanding that minors, *boys as well as girls*, are especially, and presumptively, vulnerable and subject to harm from sexual acts with adults. *Gaeta* at 9. Reasoning that the judge's remarks implied "a bias, that is, a preconception or predetermined point of view about the sexuality of minors," the Committee determined that the judge had violated the Code of Judicial Conduct in that his statements "fostered the impression of lack of impartiality" and "constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute." *Gaeta* at 10-11. In recommending a sanction, the Committee noted that the judge's record was excellent and that he had "a deserved reputation for integrity." *Gaeta* at 14. Moreover, there was no "semblance of bias, prejudice, unfairness or partiality" in the judge's "long and unblemished judicial career." *Gaeta* at 14. The Committee thus determined: that the judge's statements "were isolated,

25

situational and aberrational" and "not reflective of any underlying bias"; that the judge was "fully capable of avoiding any repetition of this conduct"; and that there was "no likelihood that similar conduct will recur." *Gaeta* at 14. Nevertheless, the Committee observed that

> [a] judge who makes such remarks, even out of inadvertence or by speaking carelessly or loosely, creates in the context in which they were spoken the perception that he or she is biased and harbors prejudices that will lead to prejudgment, lack of objectivity and unfairness. Such remarks undermine public confidence in the impartiality of the judiciary and detract from the proper administration of justice and the reputation of the judicial office.

*Gaeta* at 14-15. The Committee recommended, therefore, that the judge be reprimanded. *Gaeta* at 15. As noted, the New Jersey Supreme Court adopted this recommendation.

¶49 In light of this caselaw, several observations about the present proceedings are in order. Preliminarily, the Formal Complaint, which necessarily frames the allegations of misconduct for which Judge Baugh may be sanctioned, asserts that Judge Baugh imposed "an overly *lenient* sentence" and "justified the *unlawful* sentence by blaming the child victim" (emphases added). The Complaint goes on to relate that "Judge Baugh's assertion that the victim was 'older than her chronological age' is *inconsistent with Montana law . . . which requires evaluation of child victims based on chronological age alone*" (emphasis added). The Complaint further alleges that "Judge Baugh attempted to retract his sentence and rationale in a manner *inconsistent with Montana law*" (emphasis added). The Complaint summarizes that "[t]hrough his *overly lenient and unlawful sentence, inappropriate rationale*, and subsequent public comments, Judge Baugh has eroded public confidence in the judiciary and created an appearance of impropriety, therefore violating [Rule 1.2 of the] Montana Code of Judicial Conduct" (emphasis added). Two statements have been attributed

26

to Judge Baugh in the Complaint: (1) Judge Baugh stated that Rambold's victim was "a troubled youth, but a youth that was probably as much in control of the situation as the Defendant, one that was seemingly, though troubled, older than her chronological age," and (2) Judge Baugh later explained to members of the press that "[i]t was horrible enough as it is just given her age, but it wasn't this forcible beat-up rape."

¶50   The issue before us is not whether Judge Baugh violated the Code of Judicial Conduct; he has admitted that he failed to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary" and failed to "avoid . . . the appearance of impropriety." Mont. Code Jud. Conduct R. 1.2. The question is the proper sanction. Nevertheless, the portions of the Formal Complaint italicized above must be scrutinized in assessing the appropriateness of Judge Baugh's sanction, as they draw into question the distinction between legal error and judicial misconduct—a distinction the Court fails to acknowledge and address in its Opinion. The fact that a judge has imposed an "unlawful" sentence or one that is "inconsistent with Montana law" is not, in itself, a basis to sanction a judge. *Hocking*, 546 N.W.2d at 239. Such errors can be—and, in fact, have been in the instant matter—remedied through an appeal to this Court. *See State v. Rambold*, 2014 MT 116, 375 Mont. 30, ___ P.3d ___ (concluding that Judge Baugh lacked statutory authority to suspend all but 31 days of Rambold's sentence, and remanding for resentencing before a different judge). Similarly, exercising leniency is not, by itself, a basis for sanctioning a judge. The sentencing policy of Montana specifically states that "[s]entencing practices must permit judicial discretion to consider aggravating and mitigating circumstances." Section 46-18-101(3)(d), MCA. Furthermore, this Court has explained that

27

> Montana law provides for generalized, indiscriminate sentencing of criminal defendants, with term ranges and broad authority for sentencing courts to impose conditions. . . . [Montana's Criminal Code vests] wide sentencing discretion in the trial judge who is familiar with the character and past record of the defendant, and with the circumstances of the particular case.

*Driver v. Sentence Rev. Div.*, 2010 MT 43, ¶ 17, 355 Mont. 273, 227 P.3d 1018 (internal quotation marks omitted). Finally, a judge imposing sentence must always articulate his or her reasons for the particular sentence imposed, § 46-18-115(6), MCA, and the judge is statutorily required to consider the victim's statements, § 46-18-115(4)(c), MCA. Sanctioning the judge based solely on the fact that his or her reasons for a given sentence were expressed in an awkward or inelegant manner would potentially undermine Montana's sentencing policy. It is the judge's act of placing at issue the independence, integrity, and impartiality of the judiciary, not the judge's failure to communicate his or her reasoning using the best possible phraseology, that warrants the imposition of a sanction.

¶51 I believe this case bears a similarity to *Gaeta*. Whether or not he actually held a bias, Judge Baugh's remarks implied "a bias, that is, a preconception or predetermined point of view about the sexuality of minors"—adolescent girls in particular. *Gaeta* at 10. His statements created the perception that he harbored prejudices that would lead to prejudgment, lack of objectivity, and unfairness. *Gaeta* at 14-15. The remarks thereby undermined public confidence in the integrity and impartiality of the judiciary, and created an appearance of impropriety. It is this transgression that our sanction must address. Our purpose is not to punish Judge Baugh, but to protect the public and to promote public confidence in the judicial system. *McVay*, 158 P.3d at 200; *McComb*, 564 P.2d at 5; *Johnstone*, 2 P.3d at

28

1234. To do so, we must consider the circumstances that existed when Judge Baugh made his concededly improper remarks. Mont. Code. Jud. Conduct, Scope, ¶ 6.

¶52    In this regard, Rambold introduced into evidence, without any objection from the prosecution, two video recordings of interviews with the victim for Judge Baugh to consider when imposing sentence. I have reviewed these interviews because I believed it crucial to place myself in the same position as Judge Baugh when he was imposing sentence. While the interviews have been kept under seal and are not available for public viewing, they are, in my opinion, very emotional and tragic. Judge Baugh's remarks appear to have been based on his review of these interviews, particularly the specific statement the victim made regarding "control" as it related to her relationship with the defendant. Notably, the interviews would have led me to impose a *harsher* sentence on Rambold, had I been the sentencing judge. The interviews demonstrate the response of a youthful victim who, as is typical of youth, fails to appreciate the impact of a tragic event on her life and mistakenly believes she was in "control" of the situation. This is precisely the reason, in my opinion, that courts must intervene to protect our youth and impose a harsher sentence under these circumstances. This serves, nevertheless, to illustrate the nature of discretionary sentencing, which Montana has long followed and which the Legislature has mandated in § 46-18-101(3)(d), MCA.

¶53    In any event, the Court fails to evaluate Judge Baugh's inappropriate statements in the context of the videotape evidence that was produced at sentencing and was a basis of his decision. As a result, the Court fails to address "the facts and circumstances that existed at the time of the transgression" as required by the Montana Code of Judicial Conduct. Among

the other factors the Court overlooks or fails to address is the fact that Judge Baugh acknowledged his misconduct. *Deming*, 736 P.2d at 659 ("whether the judge has acknowledged or recognized that the acts occurred" is a factor that should be evaluated in assessing a sanction). The Court also does not address the significance of the fact that one of the statements identified in the Formal Complaint was made in the courtroom in the judge's official capacity, while the other was made outside the courtroom. Moreover, the Court has not considered whether the misconduct was an isolated occurrence, whether Judge Baugh's remarks were reflective of an underlying bias, whether he was capable of avoiding any repetition of the improper conduct, and whether there was any likelihood that similar misconduct would recur. *Deming*, 736 P.2d at 659; *Gaeta* at 14. As previously mentioned, we have no record as to Judge Baugh's length of service, whether there have been prior complaints or discipline imposed, or whether there is a pattern of conduct in Judge Baugh's personal life or official capacity exhibiting an appearance of impropriety.

¶54 Additionally, our decision to delay imposition of Judge Baugh's sanction "in order to minimize the impact of his suspension on the parties whose cases are pending before him," Opinion, ¶ 13, is directly at odds with the principle that the sanction should be designed to protect the public against further misconduct by the disciplined judge. Further, our consideration of the impact of his suspension "on the other judges in the Thirteenth Judicial District," Opinion, ¶ 13, is similarly not a valid consideration in imposing a sanction on Judge Baugh. By sheltering the sanction in order to minimize the impact on the other judges, our transparency is compromised by removing from public observation, to some extent, the judiciary's response to the misconduct.

¶55    Judge Baugh's statements unquestionably were improper and gave the impression of bias and prejudice.  He has acknowledged his misconduct and submitted himself for public censure.  Given the limited record before us and the deference I believe we should afford Commission recommendations, I perceive no basis for rejecting the Commission's recommendation of a public censure.

¶56    In conclusion, based on the record and the foregoing principles, I question whether our standardless rejection of the Commission's recommendation can restore the public's confidence in their judiciary.  We have chosen to reject the reasoned recommendation of the Commission whose membership consists of two district judges with a combined tenure of over 40 years on the bench, a seasoned attorney admitted to the bar over 50 years ago, and two citizens appointed by the Governor.  Without doubt there has been a "public outcry" against Judge Baugh and his statements at sentencing, and the easiest thing for this Court to do is to respond with an increased sanction demonstrating our intolerance for such stereotypical characterizations.  However, the independent judgment of this Court will surely be threatened if we respond to the public outcry without applying identifiable rules of analysis.  Our job, first and foremost, is to be evenhanded and transparent.  The public does not need another example, this time in their highest court, of judicial decision-making that fails to follow, or even acknowledge, restrictions imposed by rules of law.

¶57    I would adopt the Commission's recommendation, without modification.  I dissent from the Court's contrary decision.

/S/ LAURIE McKINNON

31