# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## *In re* MORROW

Docket No. 161839. Argued October 6, 2021 (Calendar No. 4). Decided January 13, 2022.

The Judicial Tenure Commission (JTC) filed a formal three-count complaint against Third Circuit Court Judge Bruce U. Morrow, arising from comments he made to two female prosecutors during a murder trial. The Michigan Supreme Court appointed retired Judge Betty R. Widgeon as master, and she issued a scheduling order providing for a virtual hearing. The master found that in Counts I and II respondent had violated Canons 2(B), 3(A)(3), and 3(A)(14) of the Code of Judicial Conduct, and in Count III, the master found that respondent had violated Canons 3(A)(3) and 3(A)(14). The JTC issued a decision and recommendation for discipline on June 14, 2021, in which it largely agreed with the master's findings of fact and conclusions of law but found that respondent had also violated Canon 2(B) by his conduct in Count III. The JTC found that respondent had committed misconduct in office by violating MCR 9.202(B)(1)(c) (defining "misconduct in office" to include "persistent failure to treat persons fairly and courteously") and MCR 9.202(B)(1)(d) (defining "misconduct in office" to include "treatment of a person unfairly or discourteously because of the person's . . . gender"). After determining that the majority of the factors set forth in *In re Brown*, 461 Mich 1291 (2000), weighed in favor of a more serious sanction, the JTC unanimously recommended that respondent be sanctioned with a public censure and a 12-month suspension without pay. Respondent petitioned the Supreme Court, requesting that the Court reject or modify the JTC's recommendation.

In a per curiam opinion joined by Chief Justice MCCORMACK and Justices VIVIANO, BERNSTEIN, CLEMENT, CAVANAGH, and WELCH, the Supreme Court *held*:

The JTC correctly found that respondent committed misconduct in office and that public censure and suspension were appropriate. However, a 6-month rather than the JTC's recommended 12-month suspension was proportionate.

1. The allegations in the formal complaint, which respondent generally did not dispute, were established by a preponderance of the evidence, and the JTC's conclusions of law were correct. By using unnecessarily crass and sexual language, respondent did not "promote public confidence in the integrity and impartiality of the judiciary," Canon 2(B), nor was he "patient, dignified, and courteous" to the attorneys, Canon 3(A)(3), nor did he treat them "fairly, with courtesy and respect" without regard to their gender, Canon 3(A)(14). As to Count III, by guessing

the attorneys' heights and weights unbidden while eyeing them, not only did respondent fail to be "patient, dignified and courteous" and to "treat every person fairly, with courtesy and respect" in violation of Canons 3(A)(3) and 3(A)(14), but he also violated Canon 2(B), which also requires that "[a] judge treat every person fairly, with courtesy and respect" without regard to their gender. Respondent committed misconduct in office by violating MCR 9.202(B)(1)(c) and MCR 9.202(B)(1)(d). Respondent's reliance on *In re Hocking*, 451 Mich 1 (1996) was misplaced: the *Hocking* Court did not hold that judges were entirely immune from discipline for comments said from the bench, and the concern expressed in *Hocking* that judges would be found to have committed judicial misconduct every time they committed an appealable error of law was not at issue here.

2. The judicial disciplinary system did not violate respondent's rights under the Due Process Clause by the JTC's serving both a prosecutorial and an adjudicative role. Respondent argued to the contrary by primarily relying on *Williams v Pennsylvania*, 579 US 1 (2016), in which a justice on the Pennsylvania Supreme Court participated in a postconviction proceeding involving a case in which he had previously, in his supervisory role as district attorney, approved the decision to seek the death penalty. The *Williams* Court held that the justice's failure to recuse himself from the case violated the Due Process Clause. Respondent contends that because Michigan caselaw on this subject relies primarily on *Withrow v Larkin*, 421 US 35 (1975), which preceded *Williams*, it is no longer good law. However, *Williams* did not overrule *Withrow*, and *Withrow* supports the conclusion that, generally, an administrative body sharing investigative and adjudicatory roles is not a due-process violation. This was the case for the JTC, particularly given that the Michigan Supreme Court instituted some degree of separation between the JTC's investigatory and prosecutorial functions versus its adjudicatory functions by requiring the appointment of a master. While *Withrow* observed that some special facts and circumstances could render the risk of unfairness in such a system intolerably high, no such facts or circumstances were apparent in this case. Furthermore, *Withrow* was the more applicable precedent because *Williams* involved a postconviction proceeding in a criminal case, whereas *Withrow* involved a professional administrative scheme such as the one at issue in this case. Even if the differences between the JTC scheme and the criminal case in *Williams* were of no import, there would still have been no due-process violation in this matter. While *Williams* held that there was an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case, respondent did not raise a similar contention regarding the personal involvement of any particular member of the JTC in his case; he only generally asserted that the JTC could not play a hybrid role in the judicial disciplinary process. Though the JTC does play an adjudicatory role, that role is minimized, given that it is the Michigan Supreme Court that provides a final adjudication and sanctions judges.

3. The Michigan Supreme Court gives considerable deference to the JTC's recommendations regarding sanctions; however, that deference is premised on the JTC's adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline. To ensure that equivalent cases are treated in an equivalent manner and unequivalent cases are treated in a proportionate manner, the Court considers the seven *Brown* factors: (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct; (2) misconduct on the bench is usually more serious than the same misconduct off the bench; (3) misconduct that is prejudicial to

the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety; (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does; (5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated; (6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery; and (7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. Because respondent's comments did not implicate the unequal application of justice to the defendant in the case being tried, the seventh factor did not support a more severe sanction, but otherwise, the JTC correctly assessed the other *Brown* factors and properly determined that additional factors supported a more severe sanction. Rather than the JTC's recommendation of a 12-month suspension, a 6-month suspension was appropriate given the severity of respondent's conduct relative to that in other judicial discipline cases such as *In re Iddings*, 500 Mich 1026 (2017).

Justice VIVIANO, concurring, agreed in full with the majority opinion but would have held that the master violated MCR 9.231(B) by not conducting respondent's hearing in person at a physical location. He reasoned that the court rule, which requires the master to "set a time and a place for the hearing," refers to a physical location, given that no dictionary defines "place" to include a virtual meeting space, that the rule was adopted at a time when telecommunications technology was not used to conduct hearings remotely, and that the Michigan Supreme Court's adoption of court-rule amendments expressly allowing for remote proceedings in the JTC under certain conditions implies that such proceedings would not otherwise have been permissible. However, because this error did not result in a miscarriage of justice, he would have concluded that the proceedings below were valid under MCR 9.211(D). He agreed that respondent committed judicial misconduct and that an appropriate sanction was a six-month suspension without pay and a public censure for the reasons stated in the majority opinion.

Justice BERNSTEIN, concurring, wrote separately only to indicate his continuing concerns relating to equity and accessibility regarding the use of videoconferencing in these situations. He noted that the circumstances of this case were unique, having taken place during a global pandemic before any vaccinations had been developed and made widely available to the general public. He expressed hope that in the future, given the efficacy and prevalence of vaccinations against COVID-19, an individual's preference for in-person proceedings would be honored to the extent that such proceedings could take place safely.

Justice ZAHRA, concurring in part and dissenting in part, agreed that respondent committed judicial misconduct and that his challenges to the proceedings were without merit. However, he strongly disagreed that a lesser six-month suspension was appropriate given respondent's history of judicial misconduct, his lack of remorse, and the absence of any assurance that respondent would conform to the rules of judicial conduct. To avoid the possibility that respondent would make a mockery of the Supreme Court and its judicial disciplinary proceedings in his remaining time in office, Justice ZAHRA would have imposed a sanction that would permanently put

respondent's judicial career to an end rather than allow him an additional six months of compensation and prestige of office.

JTC findings affirmed; six-month suspension without pay imposed.

**Michigan Supreme Court**
**Lansing, Michigan**

| | Chief Justice: | Justices: |
|---|---|---|
| **OPINION** | Bridget M. McCormack | Brian K. Zahra |
| | | David F. Viviano |
| | | Richard H. Bernstein |
| | | Elizabeth T. Clement |
| | | Megan K. Cavanagh |
| | | Elizabeth M. Welch |

FILED  January 13, 2022

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* BRUCE U. MORROW, Judge
3rd Circuit Court.

No. 161839

BEFORE THE ENTIRE BENCH

PER CURIAM.

This case comes to the Court on the recommendation of the Judicial Tenure Commission (JTC) that respondent, Judge Bruce U. Morrow, be suspended for 12 months without pay.  Respondent has filed a petition challenging the form of the proceedings and requesting that this Court reject or modify the JTC's recommendation.  We are unpersuaded by respondent's challenges to the proceedings, and we agree with the JTC's conclusion that respondent has committed judicial misconduct.  However, we hold that a lesser suspension is appropriate and impose a six-month suspension without pay as well as a public censure.

## I. FACTS

The JTC filed a formal complaint against respondent in August 2020. That complaint contained three counts of misconduct, all relating to respondent's comments to two women prosecutors during a murder trial the year before. Counts I and II alleged that respondent had used unnecessarily crass and sexual language while discussing the trial and providing feedback to the prosecutors. Count III alleged that he had a discussion with the prosecutors wherein he guessed their heights and weights, unbidden, while eyeing them.[1]

---

[1] Specifically, Count I alleged that during a break in the proceedings, one of the prosecutors asked respondent for feedback on her direct examination of the medical examiner. Respondent left the bench to sit close to her and analogized the direct examination to foreplay and sexual intercourse, with the "climax" being when the medical examiner would state the cause and manner of death. Count II alleged that while the jury was deliberating and respondent, the prosecuting attorneys, and the defendant's attorney were in chambers, respondent expressed disagreement with the prosecutor's choice to present evidence that the defendant's DNA was on the decedent's vaginal swab. Respondent exclaimed words to the effect of, "All it shows is that they fucked!" Respondent and the attorneys also discussed the defendant's testimony at trial; the defendant had said that he and the decedent had had "not normal sex" because the decedent was pregnant and they did not want to hurt the baby. Respondent and the attorneys proceeded to discuss what that might mean. The prosecutor posited that it meant something other than intercourse, while respondent contended that it meant "doggy style" intercourse. Respondent said that the prosecutor's erroneous interpretation of the defendant's testimony was due to her own bias and inexperience. When discussing the defendant's testimony that he had been concerned about having intercourse with the decedent because he did not want her to have a miscarriage, respondent remarked with words to the effect of, "Does he think his dick is so big that he would hurt that baby?" Respondent also criticized the prosecutor's voir dire by analogizing it to inquiring whether someone is willing to have intercourse on a first date. Count III alleged that when the jury was excused respondent asked one of the prosecutors how tall she was and guessed how much she weighed. The other prosecutor volunteered her height, and respondent attempted to guess her weight. When the prosecutor responded that he was wrong, respondent replied, "Well, I haven't assessed your muscle mass yet."

On September 17, 2020, the Court appointed retired Judge Betty R. Widgeon as master. She issued a scheduling order providing for a virtual hearing.[2] The master found that in Counts I and II respondent had violated Canons 2(B), 3(A)(3), and 3(A)(14) of the Code of Judicial Conduct; in Count III, the master found that respondent had violated Canons 3(A)(3) and 3(A)(14). Canon 2(B) provides, in relevant part:

> A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's . . . gender, . . . a judge should treat every person fairly, with courtesy and respect.

Canon 3(A)(3) requires that a judge "be patient, dignified, and courteous to . . . lawyers . . . ." And Canon 3(A)(14) states, in relevant part: "Without regard to a person's . . . gender, . . . a judge should treat every person fairly, with courtesy and respect."

The JTC issued its decision and recommendation for discipline on June 14, 2021. It largely agreed with the master's findings of fact and conclusions of law, but found that respondent had also violated Canon 2(B) by his conduct in Count III. The JTC found that respondent had committed misconduct in office by violating MCR 9.202(B)(1)(c) (defining "misconduct in office" to include "persistent failure to treat persons fairly and courteously") and MCR 9.202(B)(1)(d) (defining "misconduct in office" to include

---

[2] Respondent then filed a complaint for superintending control and a motion to expedite proceedings, contending that the judicial disciplinary process violated his due-process rights because the JTC serves both a prosecutorial and an adjudicative function. This Court denied relief. *Morrow v Judicial Tenure Comm*, 506 Mich 948 (2020). Respondent then filed a motion requesting that the proceedings be held in person rather than virtually. The master denied that motion, and respondent consequently filed a second complaint for superintending control. This Court again denied relief. *Morrow v Judicial Tenure Comm*, 506 Mich 954 (2020).

"treatment of a person unfairly or discourteously because of the person's . . . gender").

After determining that the majority of the factors set forth in *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000), weighed in favor of a more serious sanction, the JTC unanimously recommended that respondent be sanctioned with a public censure and a 12-month suspension without pay.

## II.  ANALYSIS

### A.  STANDARD OF REVIEW

Though the JTC makes recommendations in judicial tenure cases, this Court alone ultimately has the authority to sanction judicial officers.  Const 1963, art 6, § 30. Consequently, we review the JTC's findings and recommendation de novo.  *In re Servaas*, 484 Mich 634, 642; 774 NW2d 46 (2009).  The allegations must be supported by a preponderance of the evidence.  *Id*.

### B.  FACTUAL FINDINGS AND CONCLUSIONS OF LAW

We agree with the master and the JTC that the allegations in the formal complaint have been established by a preponderance of the evidence.  Indeed, respondent generally does not dispute the substance of the allegations. We also agree with the JTC's conclusions of law.  By his unnecessarily crass and sexual language, respondent did not "promote public confidence in the integrity and impartiality of the judiciary," Canon 2(B), nor was he "patient, dignified, and courteous" to the attorneys, Canon 3(A)(3), nor did he treat them "fairly, with courtesy and respect" without regard to their gender, Canon 3(A)(14).  As to Count III, we agree with the JTC that by guessing the attorneys' heights and weights unbidden while eyeing them, not only did respondent fail to be "patient, dignified and

4

courteous" and to "treat every person fairly, with courtesy and respect" in violation of Canons 3(A)(3) and 3(A)(14), but he also violated Canon 2(B), which also requires that "[a] judge treat every person fairly, with courtesy and respect" "[w]ithout regard to a person's . . . gender . . . ." Respondent committed misconduct in office by violating MCR 9.202(B)(1)(c) and MCR 9.202(B)(1)(d).

Respondent contends that he did not commit misconduct because in *In re Hocking*, 451 Mich 1; 546 NW2d 234 (1996), this Court held that inappropriate comments said from the bench during sentencing did not constitute misconduct. In *Hocking*, the respondent explained the downward departure sentence he wished to impose on the defendant by offering offensive and misogynistic reasons as to why he believed the defendant's conduct did not merit a within-guidelines sentence. *Id*. at 10-11. The respondent also had a very heated exchange with the prosecutor at that same sentencing hearing. *Id*. at 7-9. And in another exchange, in a different case, the respondent challenged an attorney to explain why a motion was not frivolous, and then sanctioned her without letting her provide an explanation. *Id*. at 21-22.

Respondent's reliance on *Hocking* is misplaced. First, in *Hocking* this Court never stated that judges were entirely immune from discipline for comments said from the bench. *Id*. at 12 ("Whether relief on appeal is warranted or not, it does not follow that a judicial officer is immune from discipline for the manner in which the decision is articulated."); *id*. at 13 ("A judge's comments are not immune from censure simply because they are based on facts adduced at trial or events occurring at trial."). Second, given the facts in *Hocking*, specifically the comments at sentencing, the Court was understandably wary that judges should be found to have committed judicial misconduct every time they commit an

5

appealable error of law. See *id*. at 11 ("[G]enerally, a judge is not subject to discipline for 'appealable errors of law or abuses of discretion[.]' "), quoting *In re King*, 409 Mass 590, 601; 568 NE2d 588 (1991). That concern is not present in the instant case because respondent's comments are not an appealable error of law. Therefore, we are unmoved by respondent's argument and affirm the JTC's finding that respondent committed misconduct.

## C. DUE PROCESS

We now turn to respondent's argument that our judicial disciplinary system violates his rights under the Due Process Clause because the JTC plays both a prosecutorial and an adjudicative role. The Due Process Clause of the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." US Const, Am XIV, § 1. Respondent rests his argument primarily on *Williams v Pennsylvania*, 579 US 1; 136 S Ct 1899; 195 L Ed 2d 132 (2016). In that case, a justice on the Pennsylvania Supreme Court participated in a postconviction proceeding involving a case in which he had previously, in his supervisory role as district attorney, approved the decision to seek the death penalty. *Id*. at ___; 136 S Ct at 1903-1905. The United States Supreme Court held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Id*. at ___; 136 S Ct at 1905. Applying that standard, the Court held that the justice's failure to recuse himself from the case violated the Due Process Clause. *Id*. at ___; 136 S Ct at 1907. Furthermore, though the justice's vote was not decisive, the Court held "that an unconstitutional failure to recuse

6

constitutes structural error even if the judge in question did not cast a deciding vote" because the justice might have influenced his colleagues. *Id*. at ___; 136 S Ct at 1909.

Our Court has addressed due-process challenges to our judicial disciplinary scheme multiple times in the past, and each time, we have upheld the system, including the JTC's role, as constitutional. See *In re Mikesell*, 396 Mich 517; 243 NW2d 86 (1976); *In re Del Rio*, 400 Mich 665; 256 NW2d 727 (1977); *In re Chrzanowski*, 465 Mich 468; 636 NW2d 758 (2001). Respondent contends that our prior caselaw is outdated though because it relied primarily on *Withrow v Larkin*, 421 US 35; 95 S Ct 1456; 43 L Ed 2d 712 (1975), a similar United States Supreme Court case regarding due process that preceded *Williams*. Respondent contends that under the newer precedent of *Williams*, our Court must hold that our judicial disciplinary system violates the Due Process Clause.

We disagree. It is true that our past cases looked to *Withrow* in determining the constitutionality of our judicial disciplinary system. See *Mikesell*, 396 Mich at 530, quoting *State Bar Grievance Administrator v Baun*, 395 Mich 28, 35; 232 NW2d 621 (1975); *Del Rio*, 400 Mich at 691; *Chrzanowski*, 465 Mich at 486. That is less than surprising, given that our cases predated *Williams*. However, *Withrow* is still good law. *Williams* did not overrule it. And *Withrow* still strongly supports the constitutionality of our judicial discipline scheme. As the *Withrow* Court asserted:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias

7

> or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. [*Withrow*, 421 US at 47.]

The Court further explained that both federal and state caselaw " 'generally reject[] the idea that the combination [of] judging [and] investigating functions is a denial of due process . . . .' " *Id.* at 52, quoting 2 Davis, Administrative Law Treatise (1958), § 13.02, p 175 (alterations in *Withrow*). Specifically, past United States Supreme Court cases, though recognizing the potential problem of combining investigative and adjudicatory roles, "offer no support for the bald proposition . . . that agency members who participate in an investigation are disqualified from adjudicating." *Id.*

In short, *Withrow* supports the conclusion that generally an administrative body sharing investigative and adjudicatory roles is not a due-process violation. We still believe that to be the case for the JTC. Our Court has instituted some degree of separation between the JTC's investigatory and prosecutorial functions versus its adjudicatory functions by requiring the appointment of a master. *Del Rio*, 400 Mich at 691. See also MCR 9.231. While *Withrow* remarked that there could be such "special facts and circumstances present . . . that the risk of unfairness is intolerably high" in a particular matter, *Withrow*, 421 US at 58, we do not see such special facts or circumstances in this case. See *Mikesell*, 396 Mich at 530, quoting *Baun*, 395 Mich at 35.

We believe *Withrow*, rather than *Williams*, is the more applicable precedent because the system at issue in *Withrow* is more analogous to the JTC. Whereas *Williams* involved a postconviction proceeding in a criminal case, *Williams*, 579 US at ___; 136 S Ct at 1903, *Withrow* involved a professional administrative scheme, namely the Wisconsin Medical

8

Examining Board. *Withrow*, 421 US at 37. As a body that regulates the conduct of licensed professionals, the JTC is clearly more akin to the latter.

Even if the differences between the JTC scheme and the criminal case in *Williams* were of no import, we would still find no due-process violation here. While *Williams* held that there was "an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case," *Williams*, 579 US at ___; 136 S Ct at 1905, respondent does not raise a similar contention regarding the personal involvement of any particular member of the JTC in his case. He only generally asserts that the entire JTC cannot play a hybrid role in the judicial disciplinary process. Though the JTC does play an adjudicatory role, that role is, importantly, minimized. We reiterate that it is not the JTC that provides a final adjudication and sanctions judges; that responsibility belongs only to our Court. Const 1963, art 6, § 30; *Del Rio*, 400 Mich at 689; MCR 2.951 and 2.952. Therefore, we do not believe that respondent's general allegations about the JTC's dual roles are enough to "overcome a presumption of honesty and integrity in those serving as adjudicators," *Withrow*, 421 US at 47, particularly when it is our Court that truly serves as the final adjudicator.

For these reasons, we reaffirm the holdings of our past opinions and hold, once again, that our judicial disciplinary system, specifically the JTC's role, does not violate the Due Process Clause.[3]

---

[3] Respondent also contends that by holding a virtual hearing, the master violated MCR 9.231(B), which states, in relevant part, "The master shall set a time and a place for the hearing . . . ." At the time of the hearing, Administrative Order No. 2020-19 was in place. Our Court had issued that order to provide guidance as to how best to proceed in light of the COVID-19 pandemic. That order encouraged courts to "continue to expand the use of

## D. PROPORTIONALITY OF RECOMMENDED SANCTION

The JTC recommends that this Court suspend respondent for 12 months without pay. Though this Court does give "considerable deference" to the JTC's recommendations regarding sanctions, that deference "is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline." *Brown*, 461 Mich at 1292. Our Court aims to "respond[] to equivalent cases in an equivalent manner and to unequivalent cases in a proportionate manner." *Id*.

To that end, in *Brown* we set forth seven factors that guide sanction decisions in Michigan:

> [E]verything else being equal:
>
> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
>
> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;
>
> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;
>
> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

---

remote participation technology (video or telephone) as much as possible to reduce any backlog and to dispose of new cases efficiently and safely." AO 2020-19, 505 Mich xcviii, xcix (2020). Even assuming, without deciding, that the court rule was violated, we are not convinced that such a violation would entitle respondent to a new hearing held in person, particularly when respondent largely admitted to the allegations against him and was able to thoroughly examine and cross-examine witnesses during the hearing. MCR 9.211(D) ("An investigation or proceeding under this subchapter may not be held invalid by reason of a nonprejudicial irregularity or for an error not resulting in a miscarriage of justice.").

10

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [*Id*. at 1292-1293.]

The JTC reasoned that all the factors except for the third and sixth weighed in favor of a more severe sanction.[4] We generally agree with that analysis. However, we also believe that the seventh factor—whether the misconduct involves the unequal application

---

[4] As to the first factor, the JTC reasoned that there was a pattern or practice of misconduct because, in 2004, the State Court Administrative Office had sent respondent a letter warning him not to have personal conversations with coworkers and to refrain from hugging them. That conduct resulted in an admonishment from the JTC in 2005. There was also evidence that respondent made inappropriate remarks to female prosecutors in 2018 and 2019.

Respondent contends that the JTC should not have considered uncharged conduct. But the JTC is obliged to consider prior discipline when making its recommendation. MCR 9.244(B)(1) ("The commission's report must include a list of all respondent's prior disciplinary actions under MCR 9.223(A)(2)-(5) or MCR 9.224 and must include an acknowledgement that the commission has included its consideration of any prior discipline in the commission's recommended action."). And we have upheld the consideration of evidence that a respondent judge had received admonitions and censures. See, e.g., *In re Moore*, 464 Mich 98, 117 & n 16; 626 NW2d 374 (2001).

Respondent cites *In re Simpson*, 500 Mich 533; 902 NW2d 383 (2017), to argue otherwise, but *Simpson* involved uncharged misconduct that never formed the basis for any disciplinary action. Thus, to the extent the JTC in this case considered other formal discipline, the JTC acted appropriately. We need not determine whether the JTC erred by considering other uncharged misconduct that did not form the basis for official discipline because even if such conduct is excluded, we would conclude that a six-month suspension is appropriate.

11

of justice—does not weigh in favor of a more severe sanction. We do not disagree with the JTC that respondent treated the prosecutors differently because of their gender. However, just as the JTC reasoned that respondent's conduct was not prejudicial to the actual administration of justice under the third factor, because respondent's comments did not implicate the unequal application of justice to the defendant in the case being tried, we do not believe the seventh factor supports a more severe sanction. Nevertheless, outside of that disagreement, we agree with the JTC's assessment of the other *Brown* factors, as well as its reasoning that additional factors (namely, respondent's conduct in response to the disciplinary proceedings, the effect of his conduct on the public's respect for the judiciary, and his years of experience) support a more severe sanction.

Despite our general agreement with the JTC's assessment of the *Brown* factors, we believe that rather than the JTC's recommendation of a 12-month suspension, a 6-month suspension is appropriate given the severity of respondent's conduct relative to that in other judicial discipline cases.[5] For comparison, in *In re Iddings*, 500 Mich 1026; 897 NW2d 169 (2017), the respondent sexually harassed his secretary for approximately three years.

---

[5] Though the partial dissent characterizes this Court's imposition of a 6-month rather than 12-month suspension as "reduc[ing]" the sanction imposed, *post* at 4, we are not reducing any sanction. The JTC only recommends a sanction, which our Court may accept or reject; but the JTC did not previously impose a suspension of any length. Moreover, while we would impose a 12-month suspension if we believed that to be proportionate to respondent's misconduct, we take issue with the partial dissent's advocating a 12-month suspension as, effectively, a removal from office. See *post* at 1 (saying that a one-year suspension would "effectively remove[] respondent from the bench for the balance of his judicial career"); *post* at 4 ("The Court's sanction should permanently put to an end respondent's judicial career."). If removal from office were an appropriate sanction that the Court wished to impose, we should clearly impose that sanction rather than trying to accomplish the same aim by way of a purported temporary suspension.

12

*Id.* at 1027. He was censured and suspended for six months, and the JTC also imposed disciplinary provisions consisting of mandatory counseling. *Id.* at 1030. While respondent's behavior is certainly unacceptable, we do not believe his inappropriate comments over the course of one trial merit twice the suspension imposed for years of sexual harassment.[6] Indeed, respondent's conduct would generally merit a considerably lesser sanction if considered alone; however, this is not the first disciplinary proceeding in which respondent has been the subject. See *In re Morrow*, 496 Mich 291, 308; 854 NW2d 89 (2014) (imposing a 60-day suspension on respondent for various misconduct in relation to several cases). Additionally, the respondent in *Iddings* had self-reported to the JTC (albeit after an Equal Employment Opportunity Commission investigation), was remorseful, and cooperated with the investigation. *Iddings*, 500 Mich at 1029. Those factors are not present in the instant case. Respondent did not self-report to the JTC, he has not acknowledged the highly inappropriate nature of his conduct, and he has not expressed remorse. Taking into account the severity of the behavior at issue as well as these other factors, we believe that public censure and a six-month suspension is an appropriate sanction.[7]

---

[6] Whereas the partial dissent fails to contend with *Iddings*, we believe it is important to compare the gravity of the specific misconduct in the instant case with that in past cases. *Iddings* involved misconduct similar to that at issue here, and accordingly it should be a guidepost in our sanction determination.

[7] We are unpersuaded by respondent's argument that his misconduct is not so bad as that in *In re Gorcyca*, 500 Mich 588; 902 NW2d 828 (2017), in which we ordered only public censure. *Id.* at 631. The respondent in that case had an excellent past record, and though she made comments to children involved in a divorce proceeding that were inappropriate, that she lost her temper was somewhat understandable given the lengthy and contentious nature of that proceeding and the lack of cooperation among the participants. *Id.* at 595-

13

### III. CONCLUSION

For these reasons, we agree with the JTC that respondent committed misconduct in office and that public censure and suspension are appropriate. However, we believe a 6-month rather than a 12-month suspension is proportionate. Therefore, we modify the JTC's recommendation and order that the Honorable Bruce U. Morrow, Judge of the 3rd Circuit Court, be suspended without pay for six months, effective 21 days from the issuance of this opinion.

> Bridget M. McCormack
> David F. Viviano
> Richard H. Bernstein
> Elizabeth T. Clement
> Megan K. Cavanagh
> Elizabeth M. Welch

---

596, 598 (recounting that there were 100 pleadings and 40 hearings held in the case and that the children had refused to participate in parenting time with their father). Those factors are not present in the instant case. Rather, we believe respondent's comments and past record merit a greater sanction.

STATE OF MICHIGAN

SUPREME COURT

*In re* BRUCE U. MORROW, Judge
3rd Circuit Court.

No. 161839

VIVIANO, J. (*concurring*).

I concur in full with the majority opinion, including its findings of misconduct and the sanction it imposes on respondent. I write separately to explain why I believe it was error for the master to conduct respondent's proceeding remotely rather than in person, even though this error does not render the proceedings below invalid.

## I. FACTS AND PROCEDURAL HISTORY

After the Judicial Tenure Commission (JTC) filed its formal complaint, we appointed retired Judge Betty R. Widgeon as master. On September 28, 2020, the master issued a scheduling order that stated, in relevant part:

> 1. The hearing will be held virtually, via the ZOOM and live-streamed on YouTube.
>
> 2. The following dates are scheduled for the hearing: **November 13, 23, 24, 2020, and December 7, and 15, 2020.** Counsel will confer to agree to a daily starting time between 9:00 and 9:30 am and a daily ending time between 4:30 and 5:00 pm with a daily lunch break.

Respondent filed a motion to hold the hearing in person, arguing that MCR 9.231(B) required the master to set a physical location for his hearing. He also argued that the master should protect his confrontation rights because the record in the JTC matter could be admitted in a future attorney-discipline proceeding against him. The master denied

respondent's motion in an order issued October 21, 2020. The master did not construe MCR 9.231(B) as requiring an in-person hearing. The master was also unpersuaded that the possibility of future attorney-discipline proceedings, in which the record from the JTC proceedings might be admitted, required her to hold an in-person hearing. Respondent filed a complaint for superintending control, requesting that the Court direct the master to set a time and place for an in-person hearing. This Court denied relief. *Morrow v Judicial Tenure Comm*, 506 Mich 954 (2020). After this Court denied respondent's request for superintending control, proceedings continued below, and hearings were held virtually in November and December 2020, as scheduled.

In his objections to the master's report, respondent maintained his argument that the virtual hearings the master held did not comply with MCR 9.231(B). The JTC concluded in its decision and recommendation that the master had the discretion to choose whether to hold the hearing by remote video and that the master properly exercised her discretion to proceed via remote hearing in this case. Respondent challenged that conclusion in his petition to reject or modify the JTC's recommendation. Respondent contends that the remote proceedings before the JTC are invalid because the court rules, specifically MCR 9.231(B), required the master to designate a physical place for his hearing. He also argues that he was harmed by the lack of an in-person hearing.

## II. ANALYSIS

### A. PROPER INTERPRETATION OF MCR 9.231(B)

When we interpret a provision of the court rules, the same principles that govern the interpretation of statutes apply. *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017). Thus, we begin with the court rule's plain language, examining the court rule as a

2

whole and reading individual words and phrases in the context of the entire scheme of the relevant court rules. *Id.* When the court rule's language is unambiguous, we must enforce it as written. *Id.* If a word is undefined, it is proper to consult a dictionary to aid in the proper interpretation of the court rule. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). Finally, MCR 9.200 provides the following instructions for how the court rules governing the JTC are to be interpreted:

> An independent and honorable judiciary being indispensable to justice in our society, subchapter 9.200 shall be construed to preserve the integrity of the judicial system, to enhance public confidence in that system, and to protect the public, the courts, and the rights of the judges who are governed by these rules in the most expeditious manner that is practicable and fair.

At issue is MCR 9.231(B), which establishes a number of duties assigned to the master, one of which is that "[t]he master shall set a time and a place for the hearing and shall notify the respondent and the examiner at least 28 days in advance." The word "place," respondent contends, refers to a physical location.

Our court rules do not define the word "place," and this Court has never interpreted the word as it is used in MCR 9.231(B). Although MCR 9.231 was adopted in 2019 as part of a broader update and modernization of the court rules governing judicial disciplinary proceedings, the relevant phrase—"shall set a time and a place for the hearing"—has remained essentially unchanged since GCR 1963, 932 initially established court rules governing the JTC in 1969.[1] Based on the context in which it appears, "place"

---

[1] GCR 1963, 932.10(a) stated, in relevant part, "Upon the filing of an answer or upon expiration of the time for its filing, *the commission shall set a time and place of hearing before itself or before a master* and shall give notice of such hearing to the respondent . . . ." 381 Mich xc (1969) (emphasis added). When the Michigan Court Rules were revised in 1985, MCR 9.210(B) required that the master, rather than the JTC, "set a time and place

3

is relevantly defined as "a building or locality used for a special purpose <a ~ of amusement>[.]" *Webster's New Collegiate Dictionary* (1973).[2] This definition is apt because the rule requires the master to select a location to be used for a particular purpose, i.e., "for the hearing." That the rule is referring to a physical location seems obvious on its face (even more so in light of the history discussed below), but that conclusion is obvious even before we leave the dictionary—I could not locate a single definition of "place" in any dictionary that includes as one of its many meanings (or examples) a virtual meeting space.

---

for the hearing . . . ." This provision was moved to MCR 9.210(B)(2) and changed to "set a time and *a* place for the hearing" in our rewrite of the JTC rules in 2003. 467 Mich clii (2003) (emphasis added). The provision was moved to MCR 9.231(B) in 2019 but otherwise remained the same. 503 Mich cclxi (2019).

[2] See also Lexico, *Place* <https://www.lexico.com/en/definition/place> (accessed January 6, 2022) [https://perma.cc/H6FP-N8GC] ("A building or area used for a specified purpose or activity."); Dictionary.com, *Place*, def 17 <https://www.dictionary.com/browse/place> (accessed January 6, 2022) [https://perma.cc/4YB9-WGRD] ("[A] building, space, location, etc., set apart or used for a specific purpose: *A nightclub is a place of entertainment. You are encouraged to dress modestly in places of worship.*"). The JTC believes a different definition of "place" supports its view, one that defines the term as "space in general: *time and place.*" Dictionary.com, *Place*, def 2 <https://www.dictionary.com/browse/place> (accessed January 6, 2022) [https://perma.cc/4YB9-WGRD]. But, other than the superficial appeal of having an example with language similar to the term's usage in MCR 9.231(B), that definition has no application here. For one thing, by its use of "a place," the court rule obviously refers to a particular meeting place. This would be true even if I were to agree with the JTC that the meeting place could be virtual—it would make no sense to identify as a "place for the hearing" any "space in general" on the Internet, regardless of its uniform resource locator (URL), Internet protocol (IP) address, or website domain. Either way, this definition is at such a level of generality as to be meaningless here—which is proven by any attempt to plug the definition into the rule (i.e., "[t]he master shall set a time and [space in general] for the hearing").

4

The historical context of the rule supports this conclusion. At the time GCR 1963, 932.10 was adopted, the relevant sense of "place" would have been a physical location, since the judiciary in Michigan was not using telecommunications technology for hearings at that time. See DeFoor & Sechen, *Telephone Hearings in Florida*, 38 U Miami L Rev 593, 597-598 (1984) (discussing the history of telephone hearings in courts); Poulin, *Criminal Justice and Videoconferencing Technology: The Remote Defendant*, 78 Tulane L Rev 1089, 1094-1095 & n 8 (2004) (discussing the history of videoconferencing in courts); Clark, *Symposium: The Use of Video in the Courtroom*, 1975 BYU L Rev 327, 328-329 (1975) (explaining that the federal judiciary did not start experimenting with video technology until 1970). Indeed, in the analogous context of general litigation, courthouses have historically served as important public spaces that convey a sense of community identity, legal authority, legitimacy, and decorum. Resnik & Curtis, *Representing Justice: Invention, Controversy, and Rights in City-States and Democratic Courtrooms* (New Haven: Yale University Press, 2011), pp 135-136, 303, 339, 342-344.[3] Some of the same considerations apply in the present context. Like trials and other court processes, the master's hearing is public. MCR 9.233. Additionally, JTC disciplinary actions involve allegations of misconduct by judicial officers and, consequently, are serious matters in this

---

[3] Even those currently advocating for more robust use of technology acknowledge the "everyday impression of a court" as "very much a place," meaning a "physical courtroom." Susskind, *Online Courts and the Future of Justice* (Oxford University Press, 2019), p 57. The author notes that members of the legal profession, "emotionally and psychologically, . . . often find it hard to imagine serious judicial work being carried out anywhere other than in a physical courtroom." *Id*.

state's civic life. Thus, the meaning conveyed by the term "place" at the time of its adoption was that the parties would be directed to go to a physical location for the hearing.

Providing further support for this interpretation (if any is needed) is the fact that, on two occasions, this Court has taken affirmative steps to expressly allow for remote proceedings in the JTC. The first such change occurred when the Court rewrote the JTC court rules in 2019. We added a provision to MCR 9.210 expressly allowing for meetings by telephone or teleconference if no public hearing is scheduled to be held: "Regular meetings at which no public hearing is scheduled may be held in person, by telephone, or by teleconference, provided that the telephone or teleconference method is a secure connection." MCR 9.210(F)(4). Under the canon of *expressio unius est exclusio alterius*, "[t]he expression of one thing implies the exclusion of others . . . ." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 107. The implication from MCR 9.210(F)(4) is that JTC meetings at which a public hearing is scheduled may not be held by telephone or teleconference. Although this court rule is not applicable to the hearing at issue in this case, it shows that we have acknowledged the JTC's general lack of authority to hold remote proceedings by expressly allowing remote proceedings under certain conditions. Yet a public hearing before a master is not among the JTC proceedings that we indicated may be held remotely.

The second change was made in response to the COVID-19 pandemic. The Court amended MCR 9.221(C) to allow a subpoena issued under MCR 9.221 to "require a party or witness to appear by telephone, by two-way interactive video technology, or by other

remote participation tools." MSC Administrative Order, 507 Mich ___ (July 26, 2021).[4]

But if remote hearings had been authorized by MCR 9.200 *et seq.* before this amendment, the JTC would have already possessed the authority to require a witness to appear via a remote participation tool.[5]

I would interpret MCR 9.231(B) as requiring the master to set a physical location for respondent's hearing. I believe the master erred by issuing the scheduling order providing for a virtual hearing and by denying respondent's motion to hold his hearing in person.

## B. EFFECT OF NONCOMPLIANCE WITH THE COURT RULES ON THE VALIDITY OF THE PROCEEDINGS

Noncompliance with MCR 9.231(B) does not automatically render the proceedings invalid. MCR 9.211(D), which addresses errors and irregularities in JTC proceedings, states, "An investigation or proceeding under this subchapter may not be held invalid by reason of a nonprejudicial irregularity or for an error not resulting in a miscarriage of justice." MCR 9.211(D) functions similarly to our criminal harmless-error statute, MCL

---

[4] These amendments were made after respondent's hearing occurred.

[5] The changes to MCR 9.221(C) relate only to subpoenas; no changes were made to MCR 9.231(B) or MCR 9.210(F)(4). Thus, even under the current rules, a master is still required to set a place for a hearing. For similar reasons, the JTC's reliance on Administrative Order No. 2020-19, which this Court issued in response to the COVID-19 pandemic, is misplaced. The only effect that administrative order had on JTC proceedings was to allow a subpoena to require a party or witness to appear remotely. The administrative order required courts to continue using remote participation technology as much as possible, but the JTC is not a court; therefore, the administrative order did not allow the master to appear remotely, nor did it allow the master to require respondent to appear remotely to observe the testimony of other witnesses.

769.26, except in the judicial discipline context. See 6 Longhofer, Michigan Court Rules Practice, Text (7th ed), § 9211.3, p 774.

Although the remote nature of the hearing meant that the master, respondent, and respondent's attorneys were unable to observe the body language of witnesses or verify that witnesses were not referring to materials or other individuals in the room for guidance, respondent has not demonstrated any miscarriage of justice that resulted from his hearing being held remotely. He was not deprived of the ability to put on a defense, and he was able to—and in fact did—examine and cross-examine witnesses. See MCR 9.233(A) ("The public hearing must conform as nearly as possible to the rules of procedure and evidence governing the trial of civil actions in the circuit court."). Most significantly, nearly all the pertinent facts in this case were undisputed. Under these circumstances, holding respondent's hearing remotely did not result in a miscarriage of justice.

## III. CONCLUSION

For these reasons, I would hold that the master violated MCR 9.231(B) by not conducting respondent's hearing in person at a physical location. But because this error did not result in a miscarriage of justice, I would also hold that the proceedings below were valid. MCR 9.211(D). Finally, for the reasons stated in the Court's opinion, I agree with the JTC's conclusion that respondent committed judicial misconduct and that an appropriate sanction is a six-month suspension without pay and a public censure.

David F. Viviano

8

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* BRUCE U. MORROW, Judge
3rd Circuit Court.

No. 161839

BERNSTEIN, J. (*concurring*).

I write separately only to indicate my continuing concern about the use of videoconferencing in these situations going forward. The circumstances of this case are unique, as the proceedings took place during a global pandemic; importantly, the proceedings took place before any vaccinations had been developed and made widely available to the general public. Accordingly, I concur with the majority. However, I continue to have many equity and accessibility concerns about videoconferencing. See MSC Administrative Order, 507 Mich ___, ___ (July 26, 2021) (VIVIANO and BERNSTEIN, JJ., concurring in part and dissenting in part). Given the efficacy and prevalence of vaccinations against COVID-19, to the extent that in-person proceedings can take place safely in the future, I hope that an individual's preference for in-person proceedings will be honored.

Richard H. Bernstein

*In re* BRUCE U. MORROW, Judge
3rd Circuit Court.

No. 161839

ZAHRA, J. (*concurring in part and dissenting in part*).

I agree with the Court that the Judicial Tenure Commission (JTC) properly concluded that respondent has committed judicial misconduct and that his challenges to the proceedings are without merit. Over the course of a criminal trial, respondent, under the guise of offering trial practice tips to the two young female prosecutors, repeatedly steered several conversations toward irrelevant, highly charged sexual commentaries and analogies that exceeded the bounds of appropriate professional interactions. Like the JTC, I conclude that respondent's behavior was not pedagogical but instead establishes a deliberate pattern of conduct pursued for the purpose of sexually harassing two young female lawyers in his captive audience. The JTC seeks imposition of a one-year suspension, a suspension that effectively removes respondent from the bench for the balance of his judicial career. I would impose the suspension sought by the JTC.

I strongly disagree with my colleagues that a lesser six-month suspension is appropriate. The Court makes clear this is not the first disciplinary proceeding in which respondent's inappropriate courtroom behavior has been the subject of discipline. Respondent is a frequent flyer before the JTC and has failed to demonstrate that he has learned *anything* from his previous encounters. And as his judicial career winds to a close,

respondent appears to be all the more determined to thumb his nose at the criminal justice system he purports to serve, defying with impunity the commands of the law and the Code of Judicial Conduct.[1] As explained in the JTC's decision and recommendation, respondent "had been confronted and educated by both the [State Court Administrative Office (SCAO)] and the [JTC] about misconduct that is similar to conduct he committed in this case."[2] He has since been suspended for other misconduct involving several instances of

---

[1] The JTC filed a supplemental brief indicating it has completed investigating a separate case that was dismissed with an admonition. MCR 9.244(B)(1) provides: "The list of previous disciplinary actions shall be submitted under seal and will be retained in a nonpublic manner. Disclosure of any prior disciplinary action will occur only if the information is relevant to any recommendation or imposed sanction." The information in the JTC's supplemental brief is, in my view, highly relevant to the imposed sanction because it demonstrates that respondent will continue to deliberately disregard the law and fail to behave as a judge during the balance of his judicial career.

In that matter, respondent refused to issue a deadlocked-jury instruction and instead told the jury that "sometimes beyond a reasonable doubt is actually and can be beyond all doubt." One need not attend law school to know this is not an accurate statement of the law. Respondent appeared determined to direct the jury to an acquittal, as he later charged them that "[s]ometimes beyond a reasonable doubt really, in some instances, depending upon, depends on beyond all doubt." He also instructed the jury, contrary to the law, that "you will hear people say: Oh, it's not beyond all doubt. And that's not true. In some cases, it is." He then refused to correct this clearly erroneous instruction, and a mistrial was later entered because the jury could not reach a verdict. The admonishment correspondence sent to respondent from the JTC explained that "[w]e have elected not to file a public complaint only because in [the instant case] we have already recommended that you be suspended for what will be essentially the balance of your career as a judge, so it is not a good use of our limited resources to pursue another public complaint against you."

[2] In 2004, SCAO reprimanded respondent for a variety of misconduct. With respect to his treatment of a female court employee, the SCAO letter stated:

2

his abject failure to behave as a judge. I agree with the JTC that it is clear that "[r]espondent is either incapable of conforming his behavior to the expectations of a judge, or is unwilling to do so."

It is rare for any judge of this state to have been publicly found to have committed judicial misconduct. It is a decidedly rare for a judge to have twice committed misconduct without having resigned or been removed from office.[3] Despite finding himself in these rare circumstances, as the JTC observed, respondent "has not expressed an iota of remorse. Quite the opposite, he has argued that there was nothing wrong with what he said and/or did, and has never retracted that position." He has instead insisted that at least one of the female assistant prosecutors is lying, and at the formal hearing, he repeatedly provided facts and explanations that were discredited by other witnesses and against the great weight

> You engaged in inappropriate personal conversation with a personnel staff person asking inappropriate questions and making inappropriate personal comments . . . .
>
> It is inappropriate to discuss matters of a personal nature with staff unless that individual is an acquaintance or friend (in the instance described above, the staff person was new to you) . . . .

The JTC also mentioned that there is evidence that respondent said inappropriate intimate and sexual things to female prosecutors in 2018 and 2019 that are uncharged acts of misconduct. In 2018, when ruling on a motion to suppress evidence of cell phone records in a drug case—a case that, as the JTC noted, "had nothing to do with sex or sex crimes"—respondent posed a hypothetical question to a female prosecutor to this effect: "Would I have an expectation of privacy if I were to have sex with a man in the stall of a restroom?" In 2019, respondent asked a female prosecutor who wears a hijab what color her armpit hair is, and he shared with her that he shaves his own armpits.

[3] See Michigan Judicial Tenure Commission, *Formal Complaints and Disciplined Judicial Officers (Alphabetical)* <http://jtc.courts.mi.gov/formal_complaints_and_disciplined_judges/ resolved_formals_and_disciplined_judicial_officers_(alphabetical).php> (accessed December 3, 2021) [https://perma.cc/L4VF-UVTL].

3

of the evidence. For these reasons, I agree with the JTC that "[c]ensuring and suspending [r]espondent without pay for a period of twelve months . . . is consistent and proportionate based upon the discipline other judges have received for similarly sexually-based misconduct." Given respondent's history of judicial misconduct, his lack of remorse, and the absence of any assurance that respondent will conform to the rules of judicial conduct in his waning days in office, I strain to find any rational basis to reward respondent with a lesser suspension.

I hope the Court will not rue this day, but I fear that respondent, who has failed to demonstrate that he has learned anything from his prior JTC proceedings, will make a mockery of this Court and our judicial disciplinary proceedings in the six months of prestige of office and compensation the majority has undeservedly bestowed upon him in these proceedings. The Court's sanction should permanently put to an end respondent's judicial career. Because it does not, I dissent from that portion of the majority opinion that reduces the sanction imposed on respondent.

Brian K. Zahra

4